Cooper *v.* Pittsburgh, Appellant.

Argued October 2, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Thomas E. Barton,* Assistant City Solicitor, with him *John A. Robb,* Assistant City Solicitor, and *J. Frank McKenna,* City Solicitor, for appellants.

*John E. Evans, Jr.,* with him *Evans, Ivory & Evans* and *Tobias & Tobias,* for appellees.

OPINION BY MR. JUSTICE BELL, November 22, 1957:

Janet Cooper lived in Pittsburgh a short distance from McKinley Park which the City maintained and operated as a public playground. At the time of the accident, about 7:20 p.m. on August 1, 1951, Janet, aged 12, accompanied by Barry Balach, aged 11, and Carole Malone, aged 11, went to the park. The playground covered approximately 25 acres which included a baseball field, a softball field, two tennis courts, and an area with swings, sliding boards and sand boxes. It is open to the public from one p.m. to nine p.m., Monday through Friday during the summer season. Two recreation leaders, a man and a woman, are assigned to the playground during these hours. It was customary for the male recreation leader, John W. O'Rourke, to take his supper hour between 5:30 and 6:30, and for the female recreation leader, Noranne Ott, to take her supper hour from 6:30 to 7:30, because experience had shown that that period of time was least heavily attended, probably because users of the playground were themselves at dinner. Mrs. Ott had passed through the swing area at the time she went to supper at 6:30. O'Rourke had not been in that part of the park for twenty minutes to half an hour.

The children went right to the swings and started to wrap up the chains, stand up on the swings, twist the swings around, and let them unwind. The spinning motion resulting from the unwinding of the swing made Janet dizzy and she fell over backwards. She sustained a compound fracture of the right ulna and radius and her right arm had to be amputated between the elbow and shoulder.

The jury returned a verdict in favor of the minor plaintiff in the sum of $15,865 and for the parent-plaintiffs in the sum of $1236. The City has appealed

from the judgment entered on each verdict, contending it is entitled to a judgment non obstante veredicto.

Considering the evidence, as we must, in the light most favorable to plaintiff, together with all reasonable inferences therefrom, the facts in addition to those hereinabove stated were as follows: The rules forbade children to swing double, swing too high, climb the ropes, wind the ropes around each other, push each other into the path of the swing, or swing while standing. O'Rourke was supervising or engaging in a baseball game* which was in a part of the park from which he could not see the swings. Had he seen plaintiff twisting and winding the swings he would have stopped her. The parties agree that plaintiff's injury was not due to a defective appliance or to a dangerous condition of the premises.

A swing is not an inherently dangerous instrumentality. Children of all ages have used swings for many generations; sometimes they consist of a rope tied to a tree limb; more often, two ropes tied to a tree limb with a piece of wood for a seat. Young children, even as young as four years old, have from time immemorial, used such swings, swung too high or too wide or too fast, swung double, climbed the ropes, twisted the ropes, pushed each other into the path of the swing; and done many other things while playing which every man, woman and child, and certainly every parent knows minor children do, but which involve risk, danger or injury and are forbidden by playground safety rules.

---

* O'Rourke's duties, as recreational leader, included organizing play activities, initiating group games, group participation, athletic games, team participation in a baseball league (composed of recreational centers), softball games (played by boys and girls and even little girls), Chinese checkers, stunts, story telling, and the like.

"A municipality is not an insurer of the safety of children playing on its public playgrounds. However, it is well settled that in maintaining parks and playgrounds a city must exercise reasonable care: [Citing cases]": *Styer v. Reading,* 360 Pa. 212, 61 A. 2d 382. A municipality maintaining a park or playground must exercise reasonable care to keep the property in reasonably safe condition for those who lawfully come upon it, and must also furnish reasonable policing and supervision of it in order to protect children who customarily play there: *Hill v. Allentown Housing Authority,* 373 Pa. 92, 95 A. 2d 519. The city, we repeat, is not an insurer of the safety of children. It must supervise children to the same degree that a reasonably prudent parent would do under the circumstances—in this case supervising children over a 25 acre playground.

In *Gleason v. Pittsburgh Housing Authority,* 354 Pa. 381, 47 A. 2d 129, this Court entered a judgment n.o.v. against a four year old child who fell from a sliding board while climbing the face of the board instead of using the steps to get to the top of the board. The Court said (page 383) : "An ordinary child's sliding board is not an inherently dangerous appliance requiring the presence of an attendant, or in lieu thereof a fence to exclude children from the use for which it was designed."

In *Gustafson v. Kennywood Park Corporation,* 319 Pa. 547, 181 A. 508, the park maintained a see-saw consisting of two parallel iron bars bound together with rungs, like a ladder, and suspended at the center from an iron standard extending approximately six feet above the ground in such a way that children standing on the surface could grasp the rungs at each end and see-saw as they swung up and down on the contrivance. A boy, 12 years old, climbed on the upper side of the

ladder and got his hand caught in the pivoting mechanism. This had happened on prior occasions to other boys and the attendants chased them off when they saw them there. Plaintiff contended there, as here, that the park did not provide adequate and reasonable supervision to prevent injury to children. The Court (1) held '(a) that plaintiff was liable only for ordinary care and prudence and (b) that this did not require the *constant* presence of an attendant; and (2) granted a judgment n.o.v. for the defendant.

The effect of plaintiff's contention would be to require the city to have sufficient supervisors (a) to supervise sixty minutes of every hour of every day the use by children of swings, slides, sand boxes and other amusement facilities common to playgrounds, and (b) to organize and supervise hard and soft ball games and other sports, and (c) to prevent fighting and rowdyism, and (d) to carefully watch and safeguard all the children in the entire playground virtually every minute he, she or they are there. Such a standard and, to be more specific, the standard advocated by this plaintiff, cannot be adopted because it would impose so high and so unreasonable a degree of care as to make the city, in practical effect, an insurer of the safety of every child who enters the playground.*

We have examined all the authorities relied upon by appellees, but their facts make each of them clearly distinguishable from the instant case.

Judgment is reversed and is here entered for defendant non obstante veredicto.

---

* If this standard of supervision and care which plaintiff advocates were required, it is questionable how long each city could maintain its present playgrounds and how adversely it would affect the erection of additional playgrounds.

540

Janet W. Cooper, the minor-plaintiff in this case, lost her right arm as the result of riding on one of the swings provided by the City of Pittsburgh in McKinley Park. Many of the children using these chain swings would twist them until the chains wound tight, whereupon they would release the tension by lifting their feet from the ground and spinning rapidly, enjoying the vertiginous sensation created by the rapidly turning seat on which they sat. The revolving ride produced a dizziness which, while pleasurable, as intoxication is pleasurable to the drinker, frequently deprived the rider of a sense of balance and direction.

On August 1, 1951, Janet, then 12 years of age, was participating in this type of play. At the end of an excited whirling, she tried to operate the swing in the normal pendulum fashion, but on the second upward movement she lost equilibrium, muscular grip escaped her and she toppled to the ground, sustaining severe comminuted fractures to her right arm which had to be amputated. Through her father she brought suit against the City of Pittsburgh and recovered a verdict of $15,865. Her parents were awarded a verdict of $1,236.

The City of Pittsburgh appealed, and this Court is entering judgment n.o.v. Wiping out the verdict of a jury in any case is a drastic procedure and should not be exercised unless the law imperatively dictates that it be done. I fail to see any such imperious necessity here. On the contrary, I see every reason why the verdict should be affirmed.

It certainly cannot be disputed that the City owes children using its playgrounds a reasonable degree of care. In *Paraska v. Scranton*, 313 Pa. 227, which also had to do with a child falling from a swing, we said: "Where a city undertakes to manage and supervise

property, such as public parks and playgrounds, it must take care to keep that property in a reasonably safe condition for those invited to come upon it, and *this is particularly true in the case of children in playgrounds.* It is, of course, a question of fact whether negligence or contributory negligence exists in any particular case and *the jury must determine those questions from the evidence.*"*

In *Lemak v. Pittsburgh*, 147 Pa. Superior Ct. 62, 64, the Superior Court said: "As to the duty imposed upon a municipality conducting a playground there can be no question. Public places where children play should be safeguarded *against that which is likely to harm them.*"**

Did the City of Pittsburgh safeguard the children in McKinley Park against accidents which were likely to befall them? That was the question at the trial, and that is the question which the jury decided in favor of the plaintiffs.

This Court annuls that verdict. Why? It says that a municipality is not an insurer of the safety of children. But *no one* has claimed that the City is an insurer. To reverse a decision on the supposition that the winning party defied a rule of law which, in point of incontrovertible fact, it supported, is not my idea of appellate review.

The plaintiffs, with everybody else in the case, agree that the City is not an insurer. What the plaintiffs claim, and claimed successfully before the jury, is that the City of Pittsburgh failed to measure up to reasonable care required by law in the maintenance and su-

---

* The lower Court had entered judgment for the defendant on the ground that maintenance of a public playground was a governmental function. We reversed on that contention but announced the proposition above quoted.

** Italics throughout, mine.

pervision of a city park. Who determines reasonable care? This Court or a jury? Unless we reverse what we have been proclaiming for a couple of centuries, it is the jury which decides in a factual situation what constitutes reasonable care.

The management of McKinley Park knew that children in that park twisted the swings and rode out their rapid unwindings. Supervisors were instructed to visit the swings to warn children against this practice. A. E. Risedorph, Superintendent of Recreational Activities, testified: "The leader [sometimes referred to as the supervisor] is taught what to do, and tries to inform the children that will use swings that they can't stand up, *should not twist the swings* and shouldn't swing double. Those are the rules they follow, and whenever a leader sees them disobeyed, that child is first reprimanded, and then taken off the swings to enforce that."

He testified further: "Q. If the supervisor is there, it is his duty to see the children don't do those things? . . . A. If he is close to the swings, yes . . . Q. You put that in the Manual, and say that supervisors shall *not permit children to wind up the swings,* stand up on the swings or swing double? A. That's right."

John W. O'Rourke, Jr., employed as recreational leader in McKinley Park, was charged with the duty of supervising the swings and enforcing safety regulations. He testified: "Q. As you remember, what were the safety rules you were instructed to enforce with reference to swings? . . . A. First of all you would violate riding on a swing if you stood up, *if you twisted the chains together so that when you let go you would revolve,* riding double, climbing on the frame, standing in close to the swings while someone else was swinging, pushing and running underneath the swing as you pushed."

The welfare of the children at the swings was a matter of such importance that correction of any violation of safety rules at the swings received priority over other duties devolving upon the recreational leader. O'Rourke testified: "Q. Each of those things you have listed were violations of *safety rules pertaining to swings*? A. That's correct. Q. And you supervisors or leaders were instructed to prevent that wherever possible? A. *If we were in the swing area and anything like that was taking place, that was to be remedied before we did anything else.*"

The Safety Rule Manual for the guidance of all supervisors and recreational leaders emphasized: "The safety of children on the slides, *swings,* in the sand box and in any game is most important."

Of what use are these rules if they are not to be respected by employees of the City? O'Rourke was charged with supervision of the swing which crippled Janet Cooper. He knew the rules with regard to protecting Janet Cooper and the other children, but he ignored those rules. He was cognizant of his duties, but he did not fulfill them. He was aware that children twisted swings in McKinley Park, but he made no effort to stop them. Therein lay his negligence and therein lies the responsibility of his superior, the City of Pittsburgh.

As just stated, O'Rourke owed a duty to Janet Cooper. How did he meet it? He testified that he returned from his dinner at 6:30 p.m., and saw no one at the swings. He knew that children would arrive soon after, because they usually appeared after dinner, allowing for the time needed to traverse the distance between their homes and the swings. How did he discharge his legal obligation to Janet Cooper and the other children who were to arrive in a matter of minutes? He departed at once. Not only did he not

wait, but he failed to return. Was this not absence of reasonable care? What did he do when he left? He went to play baseball. Was this not negligence?

The Majority Opinion says that at the time of the accident and immediately prior thereto "O'Rourke was supervising a baseball game." There is not one syllable of testimony in the record to support this statement. He was not supervising a game. He was enjoying a game. Counsel for the City evidently hoped to get O'Rourke to say what the Majority infers he said, but counsel was not able to squeeze out the answer he desired. O'Rourke testified: "A. . . . I was engaged in playing a little bit of ball with some of the younger and smaller boys. Q. *Were you teaching them?* A. *We had a game going.*"

City's counsel then made an heroic effort to obtain the answer which would have justified the comment made by the Majority Opinion but the question was phrased in such a manner that counsel was practically testifying. The so-called question read: "That was the first you heard of the fall, at the time you were engaged in protecting the little boys from the big boys' game?"

The Court naturally ruled out the question as leading, which is indeed an under-statement. This was one of those questions which someone has characterized as not leading the witness but dragging him!

When O'Rourke left the witness stand it was evident that he had utterly failed to do his job at the swings. The baseball diamond, on which he was playing before and at the time of the accident, was so located that anyone standing in left field was only 50 yards from the swings. Home plate was about 350 yards away. Thus, at the most, O'Rourke was only five minutes' walking distance from the swings. He made no effort to get there. He was questioned: "Q.

Between 6:30 and twenty after seven had you walked down in that area to see what was going on? A. Nó, sir. Q. If you had looked down there during that timè and seen youngsters on the swings twisting them up and climbing the framework and standing up and swinging, what would you have done? A. I would have high-tailed it down there as quickly as I could, and there would be some reprimands handed out. Q. You would have stopped it immediately? A. Yes." He gave no explanation as to why he did not see the children twisting the swings and why he did not "high-tail" over to the swings. He gave no explanation except the one which is obvious, namely, he ignored his responsibilities.

The Majority Opinion says: "O'Rourke's duties, as recreational leader, included organizing play activities, initiating group games, group participation, athletic games, team participation in a baseball league (composed of recreational centers), softball games (played by boys and girls and even little girls), Chinese checkers, stunts, story telling, and the like."

But O'Rourke was not engaged in Chinese checkers, stunts or story telling between 6:30 and 7:20 on the evening of the tragic accident. He was having a good time playing ball while the fates were twisting Janet Cooper's destinies and leaving her with a severed arm.

The Majority says that a swing is not an inherently dangerous instrumentality. That is true, but it is also true that a swing may be so used as to become very dangerous; and when a municipality knows that a swing is being operated in a dangerous way by small children, a duty devolves upon it to lessen the danger to the extent that supervision, instruction, and warning can accomplish a diminution of the peril.

Neither is a see-saw an inherently dangerous instrumentality but it requires no imagination to see how it

could easily be turned into an engine of harm. Children have been known to use a see-saw as a catapult by placing a child on one end of the plank while three or four others leap on the plank at the other end, sending the single rider sailing into space. If a park supervisor stood by passively and mutely while so dangerous a practice was being pursued and a child was hurt, the municipality involved would be liable as the City of Reading was liable in the case of *Styer v. Reading*, 360 Pa. 212, to be discussed later on.

Janet Cooper and the two children with her on the day of the accident, Barry W. Balach and Carole J. Malone, testified that they were at the swings for from 20 minutes to 30 minutes before Janet Cooper fell. During all this time no supervisor approached the swings, no one warned them not to twist the swings. Was this negligence or not on the part of the City? The management knew that swings could and were being misused. Why did not someone on behalf of the management appear at the swings to instruct the children on correct behavior at the swings? Why did the City not post signs warning children that swing-twisting was prohibited? Did the City use reasonable care under the circumstances? The jury said it did not. What right do we have to substitute our judgment for the jury on this question of fact?

The law is not unreasonable and it does not make unreasonable demands. The Majority conjures up situations which are not within the orbit of the instant case, and, on those hypothetical situations rules against the plaintiffs in a very objective proved set of facts. It aims with a blunderbuss instead of a precision rifle.

This Court has frequently found municipalities liable for accidents occurring in parks, and it has not hesitated to impose liability where a city through its agents, servants or employees, has been passively indif-

ferent to dangerous situations menacing the safety of children. An excellent illustration is the case of *Styer v. Reading,* heretofore mentioned. There, an eleven-year-old child lost an eye when another child batted a shuttlecock into his face. It was shown at the trial that although a playground supervisor was present when the children began to bat the shuttlecock back and forth at close range with no badminton net between them, she made no effort to stop them or to warn them that impending tragedy rode the shuttlecock. In affirming the judgment entered on a verdict for the plaintiff in the lower Court, this Court said:

"The pivotal question in this case is: Did the evidence warrant the submission to a jury of the question whether or not defendant exercised reasonable care for the safety of minor plaintiff? Our answer must depend upon a detailed analysis of the factual situation. Defendant was operating this playground under the exclusive control of its playground leader at the time the injury occurred. She, representing the City, *had the duty to use every reasonable effort to control the conduct of all the children present* there that day, including that of Richard and minor plaintiff . . . Would a reasonably prudent person in her position have known of the necessity and opportunity for exercising this control, and, was the conduct of the children a foreseeably dangerous activity which was creating an unreasonable risk of bodily harm to them? The answers to these questions are not so clear that they can be ruled on as a matter of law, but are questions upon which there may be a reasonable difference of opinion, and, consequently are questions solely for determination by a jury. The jury found that defendant was negligent and we are of opinion that the testimony was more than ample to support its conclusion."

Following the reasoning in the *Styer* decision, which bears the imprimatur of this Court under a date as late as 1948, why was it not a question for the jury in this case to decide whether the conduct of the children at the swings was not a foreseeable dangerous activity which created an unreasonable risk of bodily harm to them? Can we say that O'Rourke's failure to stay at the swings or to visit them after he left was conduct which this Court can declare as a matter of law as being free from negligence?

In *Hill v. Allentown Housing Authority*, 373 Pa. 92, 97, decided as recently as 1953, we approved our decision in the *Styer* and other cases and said: "Where a city undertakes to manage and supervise property, such, for example, as a public park, it must exercise reasonable care to keep the property in reasonably safe condition for those who lawfully come upon it, *including the policing of it sufficiently to protect children from dangers in connection with their entrance and play thereon.*" The Majority Opinion cites both the *Styer* and *Hill* decisions but ignores their authoritative language except where they make the stereotyped utterance that day is day and night is night; namely, that the City is not an insurer of safety.

The Majority comes out of this case with a wrong decision for many reasons, not the least of which is the one that it covers too much territory. It states and makes an issue of the fact that McKinley Park covered an expanse of 25 acres, indicating that this was a considerable area to supervise. But the litigation involved here has nothing to do with the entire park as such. We are here concerned only with that small segment of terrain which was under the immediate jurisdiction of Recreational Leader O'Rourke. As already stated, he was at the most but 350 yards away from the swings. Was it negligence for him not to visit the swings, being

so close? Was it not negligence for him not to have walked for five minutes when that stroll might have averted the dreadful misfortune which has come to the Cooper family?

After sweeping the appellate telescope over 25 acres of irrelevancy the Majority Opinion proceeds to dispose of the case on an exaggerated picture which has no possible relation to reality. It says: "The effect of plaintiff's contention would be to require the city to have sufficient supervisors (a) to supervise sixty minutes of every hour of every day the use by children of swings, slides, sand boxes and other amusement facilities common to playground, and (b) to organize and supervise hard and soft ball games and other sports, and (c) to prevent fighting and rowdyism, and (d) to carefully watch and safeguard all the children in the entire playground virtually every minute he, she or they are there."

The exaggeration of a known fault or the stretching of the period of time over which the fault *could* exist does not exonerate the tortfeasor of blame for not correcting the fault when there was time to correct it. If a child drowns in a pool because the lifeguard was inattentive or absent for five minutes at the time the child was struggling in the water, it is no excuse to say that a lifeguard cannot be present every minute of every hour of every day. The point that the Majority overlooks in its discussion of the case at bar is that the accident at the swings happened when the swings were officially active and open to the public, and not at a time when the park was somnolent with inactivity or buried beneath the dead leaves of a deceased season.

The plaintiffs do not contend that there had to be a round-the-clock, argus-eyed, ubiquitous supervision. They do not maintain that the supervisor should have

supervised the swings every minute of every hour of every day. It would have been enough if he had supervised the swings for a few minutes in the 40 minutes he was available. He was within walking distance, almost within hailing distance of the swings. This is not the case of a supervisor who is miles distant or where the supervisor had no knowledge of what could transpire. He was only a baseball field away and he had definite knowledge of what could happen. He chose to ignore what duty and humanity required him to do and, as a consequence, the catastrophe occurred.

It is a non sequitur to say, as said by the Majority, that an affirmance of the verdict here would mean that the City would have to employ enough supervisors to cover the 25 acres of McKinley Park like locusts. No one demands that there must be supervisors in the creeks and on the hillsides. No one says that supervisors must be employed to organize ball games. Since when have supervisors been needed to tell children how to organize a game which is as familiar to them as walking and running? As well employ supervisors to teach children how to eat huckleberry pie. The plaintiffs make no pretense that the City is responsible if boys enter into a rough-and-tumble fight of their own.

The Majority seeks to avoid meeting the very narrow issue in the case by enlarging the periphery of controversy to an extended arc which neither the plaintiffs nor the defendant have suggested. The Majority says that the City is not responsible for what happened in a circumscribed area of a few square feet by speculating on what would be the legal results of a situation covering 1,089,000 square feet!

The issue in this case does not cover 25 acres of ground or a similar acreage of argumentation. What the plaintiffs contend is the following; namely, when the taxpayers pay a supervisor to supervise children,

the supervisor does not perform his duty by forgetting about the children and flinging himself into a ball game of his own. When the supervisor entered into the ball game he was not engaged in supervising, he was not working, he was not organizing. He was playing, he was having a good time—at the expense of the tax-payers and at the cruel expense of Janet Cooper who has lost an arm because of his neglect, because of his indifference, and because of his carefreedness. And this Court places a premium upon such colossal neglect and negligence by arguing a non sequitur—to the extent of 25 acres!

I dissent.