Wood *v.* Conneaut Lake Park, Inc., Appellant.

Argued October 6, 1964. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused April 19, 1965.

*Stuart A. Culbertson,* with him *Paul E. Allen,* and *Culbertson & Allen,* for appellant.

*Robert Y. Daniels,* with him *Michael Hahalyak* and *John Pepicelli,* for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, March 16, 1965:

Plaintiff was seriously injured while riding a roller coaster in an amusement park owned and operated by defendant. He brought an action of trespass against

defendant and a jury found a verdict in his favor in the amount of $75,000.

Defendant asks for judgment non obstante veredicto, which the Court below had denied. It is, of course, hornbook law that the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of *every reasonable inference of fact* arising therefrom, but he is not entitled to inferences which amount merely to a guess or conjecture: *Bohner v. Eastern Express, Inc.,* 405 Pa. 463, 466, 469, 175 A. 2d 864.

The evidence may be thus summarized:

On August 19, 1956, plaintiff got into a roller coaster car with his wife and two daughters and his cousin and her husband. The car was equipped with individual seat belts and a large handrail to enable a passenger to hold on if he desired. Plaintiff sat in the front seat with his wife and one daughter; the other daughter sat with his cousin and her husband in the rear seat in the same car.

Plaintiff thus described how and what happened: "[After the train] went down the first hill and up [and down] another hill . . . I was becoming concerned about my daughter and I looked over to see how she was standing the ride, and then when I went to straighten my head up, it just seemed to 'freeze' in that position and then just out of the clear blue sky, we were on this bend and I was thrown up again' the side of the car and my wife and child was slammed over again' me and . . . it was at that point that I felt my neck snap, and then this tremendous headache, just momentarily started, and the next thing I knew, we were getting off the car. . . ."

Plaintiff never saw or noticed this bend in the course,* although his family did. When he got off

---

* Probably because he turned his head to look at his daughter at that crucial moment.

the roller coaster he sat for about 10 minutes and then walked over 200 yards to his wife's car and drove it back to meet her in the picnic area. She then drove him to the Veterans Club about 40 miles away and left him there. From the Veterans Club he went to the Eagles Club about ten-thirty, to look for his brother and to pick up his own car, intending to drive home. At the Eagles Club, he had difficulty in "navigating," experienced strange sensations in his feet and had great difficulty dancing. Two hours later he decided to go home, but when he went outside to the porch he collapsed. He spent the rest of the night on the porch, and about 7:30 a.m., a policeman saw him and took him to Franklin Hospital. He was examined there by Dr. Butters, who diagnosed his condition as polio and sent him to the Lakeside Hospital, a polio hospital at Erie, Pennsylvania. Several hours later he was taken by ambulance to the Hamot Hospital at Erie, where he remained for approximately two months. He was then taken by ambulance to the Veterans Hospital in Pittsburgh.

A neurosurgeon, Dr. Murl E. Kinal, operated on plaintiff's neck and testified that plaintiff is now permanently paralyzed in his lower body and this paralysis is, in his opinion, the result of the injuries plaintiff sustained in the roller coaster.

It is well settled (1) that defendant is not an insurer: *Cooper v. Pittsburgh,* 390 Pa. 534, 136 A. 2d 463, and cases cited therein; *Haugh v. Harris Bros. Amusement Co.,* 315 Pa. 90, 172 A. 145; *Schentzel v. Philadelphia National League Club,* 173 Pa. Superior Ct. 179, 96 A. 2d 181, and (2) that plaintiff must prove by a fair preponderance of the evidence, (a) that defendant was negligent, and (b) that its negligence was the proximate cause of the accident: *Markle v. Robert Hall Clothes,* 411 Pa. 282, 191 A. 2d 374;

*Zilka v. Sanctis Const. Co.*, 409 Pa. 396, 186 A. 2d 897; *Bohner v. Eastern Express, Inc.*, 405 Pa., supra. Moreover, a verdict will not be sustained which is based on conjecture or surmise or guess: *Steiner v. Pittsburgh Railways Co.*, 415 Pa. 549, 204 A. 2d 254[2]; *Robbins v. Kaufman*, 415 Pa. 192, 202 A. 2d 826.

As the Court relevantly and correctly said in *Schentzel v. Philadelphia National League Club*, 173 Pa. Superior Ct., supra (page 183):

". . . 'One who maintains a "place of amusement" for which admission is charged, is not an insurer, but must use reasonable care in the construction, maintenance and management of it, having regard to the character of the exhibitions given and the customary conduct of patrons invited:" Haugh v. Harris Bros. Am. Co., 315 Pa. 90, 172 A. 145.' Kallish v. American Base Ball Club of Philadelphia, 138 Pa. Superior Ct. 602, 603, 10 A. 2d 831."

When we apply this test to the facts in the instant case, it means that plaintiff must prove by a fair preponderance of evidence that defendant failed to exercise reasonable care in the erection or maintenance of its roller coaster track (or its cars and equipment) commensurate with the risk involved.

Plaintiff produced one witness to prove *this crucial point of causal negligence*. Dr. James Romualdi, an Associate Professor of Civil Engineering at Carnegie Institute of Technology, was plaintiff's witness. He examined the construction plans of the track and physically inspected it for 20-25 minutes during the trial, nearly six years after the accident. Cf. *Murray v. Siegal*, 413 Pa. 23, 29, 195 A. 2d 790. He testified (a) in general as to the engineering principles involved and (b) in particular that "with respect to the design and construction of the track itself there was a very serious violation of good, sound engineering

design features" in that the track was not adequately banked.*

Dr. Romualdi based his opinion and conclusions as to the allegedly improper construction of the curve where the accident occurred, upon the proper construction of a railroad or highway which has a completely different design. The construction of curves on a highway for automobiles traveling from 40 to 75 miles an hour is, as Dr. Romualdi testified, obviously and unquestionably different from the proper construction of a curve on a roller coaster track. It is clear that this was not an applicable analogy. Far more important, Romualdi's testimony was inadequate to sustain a finding of negligent construction. Romualdi had had no experience in designing wooden structures like this, nor had he analyzed them or examined them before trial. He testified (a) that the lateral acceleration was excessive, but he did not "have knowledge of just how much lateral acceleration a person could take"; and (b) twice in his testimony *he refused to say that the design was unsafe,* but merely said that it was not the best possible engineering design. However, the evidence showed that from the time the track had been reconstructed several months prior to the accident and until the time of this trial, 1,297,802 "human bodies" (persons) (including all of plaintiff's family) had ridden this course and absorbed the abruptness of this curve without injury. In addition to all of this, (a) plaintiff was riding in a safely hand-railed car with seat belts, and (b) admittedly failed to protect himself by holding on (if necessary) to the front rail of the car, and (c) (we repeat) none of

---

* As was to be expected, the defendant produced five experts (three of whom were builders or operators of roller coaster tracks) who testified that the track was constructed in accordance with good engineering practice and that the roller coaster course was safe.

plaintiff's party or any other person on this ride was injured at this curve or bend on this ride, and (d) plaintiff never told his first doctor (Dr. Butters) of this alleged accident on the roller coaster, and (e) plaintiff never commenced this suit or reported his accident to the defendant or presented a claim to the defendant until a few days before the expiration of the two year statute of limitations.

A majority of the Court are of the opinion that plaintiff, because of the lack of definiteness, positiveness and certainty in the testimony of his expert, failed to satisfy his burden of proving defendant's negligence, and for this reason* judgment non obstante veredicto must be entered in favor of defendant: *Bohner v. Eastern Express, Inc.*, 405 Pa., supra; *Mrahunec v. Fausti*, 385 Pa. 64, 121 A. 2d 878; *Wagner v. Somerset Co. Mem. Park, Inc.*, 372 Pa. 338, 93 A. 2d 440.

Judgment reversed and judgment non obstante veredicto entered for defendant.

---

* The writer of this Opinion would prefer to enter a judgment non obstante veredicto for defendant because of plaintiff's voluntary assumption of risk. A joyous, anticipated, jolting, jarring, bumping and violently careening ride on a roller coaster which flings you from side to side is well known to every American boy, girl and man, and is one of our most pleasant memories. It is clear as crystal that plaintiff voluntarily and with full knowledge assumed the dangers of the ride and the risk of injury by being flung from side to side, when he rode this roller coaster. In *Schentzel v. Philadelphia National League Club*, 173 Pa. Superior Ct., supra (page 186) the Court pertinently stated: "We quote at length from Prosser on Torts at pages 383-384: 'By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself, and relieve the defendant of responsibility. Those who participate or sit as spectators at sports *and amusements* assume all the obvious risks of being hurt *by roller coasters*, flying balls, . . .'". Accord: *Douglas v. Converse*, 248 Pa. 232, 93 A. 955; *Repyneck v. Tarantino*, 415 Pa. 92, 202 A. 2d 105.

Mr. Justice COHEN concurred in the result.

Mr. Justice EAGEN dissents.

---

CONCURRING OPINION BY MR. JUSTICE JONES:

My study of this record indicates *clearly* that no actionable negligence has been shown. Therefore, I concur in the result reached in the majority opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

A roller coaster ride is one of the fond, nostalgic memories of childhood. There is that first momentous, awesome ascent up the steeply inclined track, then, at its peak, the sudden, heart-stopping precipitous descent, then another sensation-charged climb, and once more a breath-taking fall with nerves tingling, hair flying, amid joyous shouts and laughter, then the racing over a straightaway which slams into a curve, the exciting careening around the bend, then a rapid succession of rocketing ups-and-downs, whirlwind dips, more adventuresome curves through leaf-flowering trees and fragrant foliage, and then the happy exhaustion from thrills, fun and uninhibited excitement.

The thrills of a roller coaster are not only for children but for their parents who enjoy them in double measure through the sensations of their squealing offspring, yelling with delirious delight that only children can know.

On August 19, 1956, George M. Wood embarked on such a ride with his wife and two young daughters on what was known as the "Blue Streak" at Conneaut Lake. The journey began in mirth and gayety and ended in stark tragedy. From the height of exaltation, with his wife and children, George Wood plunged to the depths of disaster for himself and family. At one point of the thrilling expedition, Wood, out of a devoted solicitude for his children, one (Barbara) sitting in the seat next to him, and the other (Sandra)

in the seat behind him, turned his head to see how Sandra was "standing the ride." At that moment the car rocketed into a sharp curve and he was thrown against the side of the car, the weight of the bodies of his wife and daughter pressing against him. He felt as if he were being jerked out of the car by a "tremendous force," and he sensed a great pain in his head. When the cars finally stopped at the terminus of the journey, Wood got out considerably shaken, sensing a sharp torment in his head and neck.

The next day he was taken to the Franklin Hospital and from there to the Lakeside Hospital and several hours later, to the Hamot Hospital in Erie where Dr. Murl Kinal performed an operation on his neck. The surgeon found that Wood had sustained a serious tear of the 5th and 6th cervical nerves and a disc protrusion which had forced the spinal cord out of alignment, precipitating a catastrophic paralysis of his lower body, permanent in character. For George Wood there will no more be ups and downs in life; for him there will be a constant deterioration for the rest of his days. The wreckage inflicted on his anatomical system is such that although only 36 years of age at the time of the accident, he now possesses no more capacity and strength to attend to his daily needs than would a three-year-old child. He cannot take food, bathe, or even tie his shoes without assistance. Henceforth, his only objective in life will be to struggle to keep alive in order that he may go on enjoying his unrelieved misery.

It was Dr. Kinal's professional opinion that Wood's physical disaster was the direct result of the injuries he sustained when he was violently thrown to the left of the roller coaster car as it was making a sharp turn to the right. It developed from an inspection of the Blue Streak track that it had been faultily constructed at the very point where the plaintiff's neck

was violently wrenched. Dr. James Romualdi, associate professor of Civil Eengineering at Carnegie Institute of Technology, declared, after studying the construction plans of the roller coaster and physically examining the track that, "with respect to the design and construction of the track itself, there was a very serious violation of good, sound engineering design features." He said that the curve in question was too abrupt for the human body to absorb, with a car traveling at the speed and under the conditions prevailing at the crucial moment. He explained: "Before entering a straightaway, and then into a portion of a curve of constant radius, it is necessary to have what we call a transition or spiral curve, one which very gently goes from a straight line into a section of constant radius."

*That* transition or spiral curve was missing in the Blue Streak at the vital spot. Woods brought suit against the Conneaut Lake Park, Inc., owners of the Blue Streak, and the jury returned a verdict in his favor for $75,000. The trial judge stated that the verdict was a "very modest" one, in view of the "tremendous damage sustained by this unfortunate man." The trial judge pointed out that, with Wood's life expectancy of more than 30 years, "his loss of wages and further earning capacity alone would amount to more than $120,000."

That figure would not take into account the pain and suffering endured and yet to be endured by George Wood who, instead of boldly striding through the 30 years of golden life ahead, can only crawl through them as a three-year-old child. But as modest as was the $75,000 figure, as inadequate as it was to offer Wood the crutches on which to hobble along during those miserable 30 years, this Court has wiped *that* out, so that Wood must now look at life not only as a helpless cripple, but as a helpless indigent and possible mendicant.

So drastic a decision calls for an explanation which will satisfy those people who look upon the courts, and especially the appellate courts, as the fountain of wisdom. I submit that that satisfaction will not be forthcoming from a reading of the majority opinion.

The majority opinion states that 1,297,802 "human bodies" had ridden the course "and absorbed the abruptness of this curve without injury." There is not a word or a syllable in the testimony to support this statement. The trial record does not show that 1,297,802 persons testified that they had not been injured. This volunteered conclusion of the majority is founded on the statement of a defendant's witness that there was *no record* of accident during the period in question. This is far from stating that no accident occurred or that no one had been injured. Many people could have sustained substantial jolts which did not seriously disable them. Others may have been injured but the symptoms did not become manifest until later and then they did not connect them with the roller coaster ride. Others may have known they were injured by the roller coaster ride but preferred not to litigate.

In addition, it does not matter how many rode without injury. The question is: Was there anything wrong with the Blue Streak on the day, hour and minute that the plaintiff was injured? As the trial court cogently stated: "The outstanding fact about this case was that plaintiff got on this Blue Streak a well man only 36 years of age and within a few hours after he got off, he was a helpless cripple for the rest of his life." One cannot dispose of this cause-and-effect equation by the casual statement that others rode the Blue Streak and were not injured. The jury heard the evidence, they listened to the statement about the 1,247,802 supposed rides, and they concluded that the figure was exaggerated, that it was untrue, or that it

was irrelevant. They were the fact-finding body and it is not the province of the appellate court summarily to dismiss that finding without giving some reason for it, none of which appears in the Majority Opinion.

Moreover, before the fact of the multitudinous rides can be compared to the single ride involved in this case, there must be proof that the conditions in the million rides were exactly similar to the ones present in the instant case, as, for instance that there were three passengers in the front seat as in this case (although ordinarily only two sit in the front seat), that the weight of the passengers in the front seat, in all the million rides was the same as that on the Wood ride, that the heights of the persons in the front seat in all the other rides tallied with the heights of the persons on this ride. There would have to be a determination also as to whether the passengers on all the other rides were aware that they were coming to an abrupt bend. Also, did the passengers on the other rides brace themselves when they came to the bend or did they all slide over and crush the person on the outside seat, as happened in this case? When questions of this type were put to T. Darwin Kepler, the defendant's promotion manager, defendant's counsel objected, stating, "these very questions show the impossibility of an answer, asking this witness for a conclusion which he or nobody else could answer." This objection in itself shows that the one million ride figure can have no application to the one particular ride we are here considering.

There are innumerable variables which have to be considered before one can base a conclusion on a multiplicity of events as against the one which is in focus. A million pedestrians may pass over a defect in the sidewalk and not be injured, but the 1,000,001st traveler may fall into the hole or trip over the defect and, if the facts reveal that the hole was caused by the

negligence of the municipality, the injured person is entitled to a recovery, regardless of the army which had the good luck to pass unscathed over the danger which reached up and pulled down that 1,000,001st traveler to his doom. If cases of this kind are to be decided on mere numbers instead of cause and effect, and logic and reason, there can be no need for a judicial inquiry. A comptometer will suffice, an I.B.M. machine can dictate the verdict, a unifax can displace the jury and eventually the judge himself, all of which, of course, is absurd.

An accident can sometimes be an engineering masterpiece of unrelated but concomitant incidents. A hundred factors, a score of agents, numberless people may all unconsciously cooperate to cause the Bridge of San Louis Rey to fall. Weather, location, chemical effects, play of physics, mechanical idiosyncracies may all concatenate to effect a pivotal calamity. Perhaps only once in 10,000 or even a million cases, will all those forces combine with the precision of a mathematical table to trigger the disaster, but when it happens, investigators dig into the debris, interrogate witnesses, study the locale and conclude that it was the missing bolt, or the unscrewed nut which precipitated the disaster. Airplanes have probably flown millions of times with a missing bolt or an unscrewed nut, but comes the day that wind, temperature, speed and wear and tear all conspire with that unscrewed nut to accomplish the terrestrial crash. And it is no excuse in such a situation to say that on other occasions the loose nut had not produced the fall of a plane and that, therefore, it cannot possibly be the cause of today's calamity.

In addition, it is *not true* that of the million plus people who rode the Blue Streak after the reconstruction in 1956, no one, except George Wood, was ever injured. Miss Diane Jean Ion testified that on June

17, 1960, she rode the Blue Streak with grave consequences. During the ride her neck snapped and she was so disabled that she had to be lifted out of the car and taken to a hospital. She lost feeling in her body from the waist down, but fortunately her paralysis was not permanent, as, tragically, the plaintiff's is.

The majority opinion would argue that because no one else was injured on the particular ride under discussion Wood could not have been injured either. This is a non sequitur. Every day there are serious accidents—planes crash, automobiles collide, trains jump the track—some passengers walk away unscathed, others are injured and then there are the few who feel desperately the blast of the scalding steam or the impact of the hot, ripping, jagged steel. But this is only illustrative discussion, because it just happens that it is not true that the telltale ride of August 19, 1961, was a normal one and that no one was disturbed except Wood. Mrs. Jane Morrison, who rode in the same car with Wood, testified that she had ridden the Blue Streak 50 times prior to August 19, 1956, and six or seven times before the fateful trip. She described that trip as being so "rough" that she gave away her remaining tickets and never rode the Blue Streak again. She explained the reason for the "roughness": "Well, there were more adults on that ride, it was heavily loaded." She said the trip was "more jerky."

Arnold Smith, another passenger with Wood, testified that "I got shook up enough that I never rode it since." Mrs. Betty Wood, the plaintiff's wife, testified: "Well, we went over on this right turn and it just threw my daughter and me over against my husband . . . we were thrown over against him with terrific force."

Mrs. Virginia Smith testified that the ride was unusual and that she saw "his (Wood's) neck jerked back."

In addition to all this, it is no small thing to consider that Wood was injured at the very spot where other accidents had occurred previously. The promotion manager Kepler testified that four persons had sustained collar bone fractures because of defects in the track at this point, and, in 1956, the management decided to make a change. The change, however, effected no cure since the defendant merely elevated the track, doing nothing to draw the fangs of the dragon—the abruptness of the curve which snapped collar bones. Placing the defective track on stilts did not cure the defective track. It was like lifting a steel trap from the basement to the first floor. It was like taking a caged. tiger from the first floor to the second floor, but still leaving the cage door open. It was like trying to remedy a broken rail on a railroad track by elevating the track to the top of a hill but not replacing the rail.

The defendant was additionally negligent in that it had this vital reconstruction work done by a man (Frank Hoover) whose competency left much to desire. He was questioned: "Q. Have you ever studied any courses of an accredited basis from any college or university in connection with civil engineering? A. No, sir. Q. Or dynamic engineering? A. No, sir. . . . Q. Are you able to work out a mathematical equation regarding forces and directions? A. No, not too well."

An idea of the blundering manner in which Frank Hoover went about this sensitive task can be gained from the fact that although his stated objective was to reduce the speed of the cars at this point, he never clocked the speed of the cars!

The more one studies this case the more one is apt to conclude that the majority did not clock the momentum of the plaintiff's demands for justice. George Wood has established a clear case of negligence and

he should not be deprived of the modest verdict (modest in view of the gravity of his disablement) which the jury awarded him. He proved a tortious accident and proved the faulty construction which was responsible for the tort. We have here simply a question of cause and effect. If the roller coaster track had been built in accordance with sound engineering principles no necks would have snapped and no vertebrae would have crumbled. This was testified to by the estimable authority of Dr. Romualdi, who is not only an assistant professor at one of the greatest engineering schools in the country (the Carnegie Institute of Technology) but is director of the Pittsburgh section of the American Society of Civil Engineers; a member of the International Association for Bridge and Structural Engineers and the American Society of Engineering Education, as well as a former chairman of the American Society of Civil Engineers and the Pittsburgh Council of the American Society for Testing Materials.

The majority opinion says that Dr. Romualdi "examined the construction plans of the track and physically inspected it for 20-25 minutes during the trial, nearly six years after the accident," conveying the impression that Romualdi's examination of the plans was a mere, cursory one. The momentous fact, however, is that he had the plans in his possession and studied them for 8 months prior to the trial. That Dr. Romualdi did not examine the track until six years after the accident was of no consequence if the track was in the same condition (and this was not questioned) as it was when the accident occurred. In addition, it is particularly to be noted that Romualdi had motion pictures taken of the Blue Streak in action and he studied these films, which would undoubtedly give him a better appreciation of the forces involved in the movement of the roller coaster cars than a personal view would give him, because he could never get as close to the movement as a telescopic camera view.

The majority opinion states that "Romualdi's testimony was inadequate to sustain a finding of negligent construction." The majority advances nothing to sustain this startling conclusion. The record reveals that Romualdi's testimony was more than adequate to prove the negligence of the defendant in the construction and maintenance of the Blue Streak. The defendant admitted there was fault in the track in 1955 and attempted to remedy the fault, as already stated, in 1956. Romualdi testified that the job was poorly done and the jury accepted his testimony.

Who is more qualified to pass on a witness's qualifications: the trial judge who sees and hears the witness and observes him over a number of days, or the appellate court which is confined to a reading of the record? The answer is obvious. This is what the trial judge said of Romualdi:

"We thought Dr. Romualdi's qualifications were quite impressive particularly compared to the expert witnesses called by the defendant . . ." In addition, the trial judge said: "Experts with far less qualifications than Dr. Romualdi were permitted to testify on behalf of the defendant that the ride was properly designed and safe for the purpose for which it was intended."

In addition to improperly slighting Romualdi's testimony, the majority misapprehends that testimony. The majority opinion says that Romualdi testified that "the track was not adequately banked." Romualdi did not so testify. He testified to the contrary, that there was banking where there should be no banking: "This track starts to go into an embankment before it ever gets to the curve. It's on the straightaway and this I was able to check when I visited the site. The track starts to bend, but *there's no reason for the bank,* because there's no turning. The result is that instead of being a balance with lateral forces and

vertical forces, the passenger finds himself starting to lean over this way, and is forced by either holding the railing, or by pushing against the next occupant, to keep himself in a vertical position, but he shouldn't have to do this, because in this unfortunate set of circumstances, while he's pushing or tending to lean to the left suddenly the car make—turns to the right and he's already pushing in that direction, and so the situation is *even worse than if he had no embankment at all*, just dragged the car flat around the curve." (Emphasis supplied).

Romualdi also testified that the car in which Wood rode was not equipped with springs and that its design "was not proper for that particular location."

The majority opinion disposes of Romualdi's superb engineering qualifications and particularized knowledge of the Blue Streak by stating that the defendant produced five experts to support the defendant's theory of non-negligence. This is a variation of the 1,297,802-riders theory. The fact that five "experts" testified that the track was safe did not make it safe. We have repeatedly said that proof is not determined by a preponderating number of witnesses. The jurors, as well as the judge, saw the five defendant experts and they concluded that they were unreliable, and there is nothing in the majority opinion to buttress their testimony. The fact that reference to the testimony of the defendants' experts was relegated to a footnote in the majority opinion would suggest that even the majority was not any more impressed than was the jury.

The majority opinion endeavors by inference to suggest that possibly the plaintiff was not even injured on the roller coaster and states that after the alleged accident he went to the Eagles Club where he "had great difficulty dancing." This assumes that Wood was actually dancing and, of course, it is a gen-

erally accepted fact of life that a dancing person is not only in good physical condition but in good spirits as well. But Wood did no cavorting on the dance floor. He testified that when he arrived at the Eagles Club looking for his brother, who could possibly help him, he felt his feet getting numb. He stamped them, trying to drive away the deadening sense. When this failed he thought he would endeavor to get feeling back into his feet by trying to dance. He took five or six steps and had to desist. Mrs. Margaret Bell, who was his partner in this endeavor, testified: "Well, I know we didn't take over five or six steps and he said to me . . . 'Peggy, I guess I am going to have to take a rain check on this dance, because my feet don't "track" and my feet are numb.' "

The majority opinion says that the plaintiff did not tell Dr. Butters at the first hospital to which he was taken, of his injury on the roller coaster. The plaintiff was in a state of collapse when he was driven to that hospital and what he may or may not have said while in that condition can hardly be conclusive of the historical facts. In addition, the plaintiff testifed that mention was made at the Franklin Hospital of the ride at Conneaut. That very same day, Wood was transferred to the Hamot Hospital where he gave a history of the roller coaster ride and the hospital records bear this out. In addition, it is not disputed that on the very night of the accident, while at the Eagles Club, he spoke, of the violent roller coaster ride, to Richard Bell, who testified: "He Wood said he had a snapping in the backward direction, or something to that effect and he noticed after that, after he came off the ride that he had severe pains in the head and headache, rather, and prevailed there throughout the afternoon and evening."

With even only this scant review of the record, how can the majority possibly justify its rendering of a judgment n.o.v.? It is understood that in the rare-

fied atmosphere of a high court, judges are not to be moved by sympathy for the plight of litigants. Even so, a court should not take away a verdict—which means bread, medicine and crutches—from a helpless cripple, a verdict won in a fair trial, when there are no clear reasons to justify that deprivation. Such reasons do not appear in the majority opinion or in the record.

The majority is simply substituting its judgment for that of the jury and this it may not do where a pure question of fact is involved. The majority opinion points to no error in the trial which lasted six and a half days. The cause was tried by excellent counsel, the trial was presided over by a very able judge who properly instructed the jury. The majority opinion emphasizes what does not need to be emphasized, namely, that an amusement park owner is not an insurer of the safety of his patrons. That is absolutely true. It is also true, however, that he cannot ignore the fundamental rules of safety. If a railroad or traction company is required to exercise due and proper care when it transports passengers, how much more does that duty devolve upon an amusement park owner who devises means to entertain his paying customers? He has the duty to see to it that his alluring devices do not become engines of destruction. Nothing can be more cruel than to so negligently maintain a device for entertainment that, in a moment's time, laughter turns into tears, happiness into grief, joy into misery, elation into disaster—not for a minute, not for a day, but for a lifetime.

If an amusement device is hazardous to riders, the owner of the device must exercise a care "commensurate with the risk involved," and "the more hazardous the amusement, the greater is the caution required." This criterion was laid down in *Lausterer v. Dorney Park Coaster Company, Inc.*, 100 Pa. Superior Ct. 33.

In that case a 16-year-old girl fell to her death from a roller coaster. Her parents averred that the fatal accident would not have occurred had the defendant company equipped the cars with safety belts or side guards. The Superior Court said: "A strict measure of duty is required, therefore, of the operator of a roller coaster, as that is an inherently dangerous device, with its inclines, dips, sharp curves, and high speed, which demands care depending on the danger to be avoided."

The trial court in that case submitted to the jury the question as to whether the company had exercised proper care in protecting patrons against preventable injury. The jury returned a verdict for the plaintiffs which the Superior Court sustained.

The owner of an amusement park device is charged with the responsibility of creating, operating and maintaining his device so that he knows where thrills end and disaster begins. The owner of a shooting gallery, cannot, for instance, defend, in the event of a ricocheting bullet which injures a passerby or even the firer himself, that this is a danger to be expected in rifle shooting. It would be his duty, in maintaining a shooting gallery for hire, to have the surface receiving the bullets constructed of such material that the bullets would imbed themselves therein rather than bounce therefrom.

George Wood was a healthy man. He served in World War II as a combat bombardier and aerial gunner. As a youth at high school he participated in vigorous, competitive, athletic games, particularly basketball. He continued his love of sports and often went bowling and swimming with his family. He had a good position with the Chicago Pneumatic Tool Company. He is the father of five healthy children. How and why should a person with so salubrious a background, so normal and healthy an economic and social status, suddenly become a helpless invalid? All the

evidence points but in one direction—that tragic ride of August 19, 1956. The majority arbitrarily turns the weather vane against the wind and enters judgment n.o.v. No law supports this usurpative function.

The trial judge well stated it, as I have indicated, and it bears repetition: "The outstanding fact about this case was that plaintiff got on this Blue Streak a well man only 36 years of age and within a few hours after he got off, he was a helpless cripple for the rest of his life."

There is no possible logical explanation for this appalling metamorphosis except the one clearly spelled out in the plaintiff's case. The majority ignores this logical, easily understood explanation and seizes upon one which is sheerly arbitrary, one which is based on forced reasoning, assumed circumstances and inexplicable discarding of evidence. The majority in effect says that the accident could not have happened in the way described by the plaintiff and his witnesses, accepted by the jury and affirmed by the trial judge. But in adopting this arbitrary conclusion the majority offends against what perhaps is the most momentous rule this Court has laid down during the last half century as to the province of the jury in trespass cases, namely, "It is not necessary, under Pennsylvania law, that every fact, or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." *Smith v. Bell Telephone Co.*, 397 Pa. 134.

In the case at bar the facts not only say that the preponderance favors liability, but they *overwhelmingly favor liability!*

The entering of judgment n.o.v. in this case is not only a sad day for George M. Wood, but for justice, and I vigorously register my opposition thereto.

Mr. Justice O'BRIEN joins in this dissenting opinion.