Cummings, Appellant, *v.* Nazareth Borough.

Argued May 24, 1967. Before BELL, C. J., MUS-MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Norman Seidel,* with him *Gus Milides* and *Herbert Toff,* for appellants.

*E. Jerome Brose,* with him *John C. Hambrook,* and *Brose, Poswistilo & LaBarr,* and *Fox, Oldt & Hambrook,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, September 26, 1967:

On July 30, 1963, Darrel L. Cummings, 16 1/2 years of age and of excellent health, dived into the

swimming pool owned, operated and maintained by the Borough of Nazareth. He failed to surface. A swimming companion started in search and found Darrel lying face downward on the floor of the pool. He helped him to a ladder where a lifeguard lifted him to the pavement. Darrel was seriously injured. He suffered a subluxation of the 4th and 5th vertebrae and a fracture of the 6th, which left him a permanent cripple, paralyzed from the chest down, to be imprisoned in a wheel chair for the rest of his life.

Darrel, through his guardian, Mrs. Dorrace Cummings Woodward, and Mrs. Woodward in her own right, brought suit against the Borough of Nazareth, charging it with negligence in the construction and maintenance of the pool. The jury returned a verdict in favor of the minor plaintiff in the sum of $150,000, and in favor of the guardian in the sum of $65,000. The defendant moved for judgment n.o.v., which was granted by the trial court and the plaintiffs have appealed.[1]

The Nazareth swimming pool, which was built in 1935, measures 200 feet by 100 feet. It is 8 ft. 5 1/2 inches deep in the center and of decreasing depths toward either end into the more shallow areas. One-meter boards (so designated because they are supposed to be one meter above the level of the water) are located on either side of the deeper areas.

Darrel dived from a one-meter board into the depth of water, later ascertained to be 6 ft. 8 7/8 inches deep. Swimming pool experts testified that the water depth, for safety sake, under a one-meter board should measure from 9 to 10 feet. It is obvious, of course, that the deeper the water into which a swimmer dives,

---

[1] The plaintiffs in their original suit included the lifeguards Fred Hahn, Frederick Knecht, Jr., and Joseph Merola as defendants. At the trial a nonsuit was entered in favor of the lifeguards and they do not figure in the appeal.

the less chance there will be that he will hit bottom. The Nazareth pool was encircled by what is known as a scum gutter 1 1/2 inches below the deck of the pool. In well regulated pools, the surface of the water should be more or less level with the scum gutter. On the day of Darrel's accident, the water level was about 5 inches below the scum gutter. Thus, the plaintiffs contended, the meter board, intended to be one meter or 39.37 inches above the water was, in reality, 44.37 inches above the water because of the recession of the water below the scum gutter. This meant Darrel plunged a greater distance before he hit water (incidentally acquiring increased diving momentum) than would have been normal if the water had been level with the scum gutter.

It might seem that this meticulous dealing in inches and fractions thereof makes of the issue in the case a matter of technical measurement. It is indeed just that differential in inches which could make the difference between safety and serious injury. If Darrel had been able to straighten out from his dive even one inch above the bottom, he might not now be a paraplegic. A miss, it is said, is as good as a mile. However, the margin between safety and danger was *more* than an inch. It was at least 2 feet 3 inches.

Why didn't the pool owners provide this extra depth, which would offer the swimmers a buffer of water protection? "Among the duties relating to diving which have been imposed by the courts on the proprietors . . . of bathing resorts or swimming pools are the duties to use care to provide . . . water of a reasonably safe depth, free from obstructions, or to warn patrons of the danger in diving . . . of the insufficient depth of, or obstructions in, the water" (48 A.L.R. 2d 104, 129, §15)[2]

---

[2] "It is the duty of the owner to maintain such premises in a reasonably safe condition for the contemplated uses thereof by

18

The lower court, in entering judgment n.o.v., said that a swimming pool is not a dangerous instrumentality and that, therefore, the defendant borough was not charged with the kind of responsibility which goes with a dangerous instrumentality. In this respect, it cited *Cooper v. Pittsburgh,* 390 Pa. 534, where this Court held that the city defendant was not guilty of negligence because of alleged failure to properly maintain a swing in a public park. The trial court's analogy is hardly apt. To say that a large body of drowning water can be compared to a swing is like saying that a tiger can be compared to a kitten because they are both of the feline family. So far as danger is concerned, there is no more similarity between a swing and a large expanse of water than there is between a bicycle and a bulldozer. Water, as indispensable as it is in the maintenance of life, can be as destructive and all-annihilating as fire. The ocean itself is a graveyard of empires of populations and treasure. Every person who enters into water deeper than his height is in peril of death. To establish this point it is not necessary to refer to the countless drownings which occur in rivers, lakes, ponds, and even bath tubs.

The intrinsic danger of a swimming pool is evident in the presence of lifeguards. Wherever people publicly congregate to swim, dive and divert themselves in the water, a lifeguard is a compelling necessity. No boat larger than a skiff ventures into open water without a lifeboat aboard or trailing in its wake. As fire, which is man's faithful servant, in preparing his dinner and warming his home, is, unless guarded, capable of destroying that home and its occupants, so, too, wa-

those who come by invitation express or implied." *Jemison v. Pfeifer,* 397 Pa. 81. "The diving board was an invitation for the use, with an implied representation that its use was not dangerous." *City of Ferguson v. Marrow,* 210 F. 2d 520.

ter on a rampage may inflict death and destruction with the havoc of an earthquake. Even when water carries the most innocent face, it may be masking a terrible threat to life, body and limb.

The Borough of Nazareth employed at least four lifeguards, able, ready and eager at all times to speed to those who falter or weaken in the water, or have any reason at all to need natatorial assistance. But these lifeguards could not save Darrel from hitting his head against the concrete bottom of the pool because they had no facilities to dig a deeper bottom where Darrel dived, nor, apparently, did they know that a deeper bottom was necessary to save broken backs. The Nazareth pool, as it existed on July 30, 1963, was a dangerous instrumentality even though dedicated to health, exercise and entertainment. The jury so found and the evidence supports their conclusion. A diving pool without a sufficiently deep bottom is as much a dangerous instrumentality as a roller coaster with a rail missing, a ferris wheel without safety belts, or an ice skating rink with bare patches to trip and tumble the skaters.

It may be said, in passing, that in its opinion absolving the defendant from all blame in construction and maintenance of the pool, the trial court makes not a single mention of the expert witnesses who testified to the intrinsic dangers built into the pool, even though their combined testimony covered some 70 pages of the printed record.

The trial court was persuaded into believing there could be no hazard in use of the Nazareth pool because, over a period of 10 years, there had been a half million admissions into the pool. Millions of people had safely crossed the Atlantic before the *Titanic* sailed from Southampton boasting a prodigality of ballrooms, restaurants, orchestras and recreational devices never found aboard theretofore, but this mistress of the

seas did not carry enough lifeboats to save from an ice-strewn watery grave the 1517 passengers who had depended upon the ship's owners to manifest as much concern over safety as over sumptuousness. The negligence of the *Titanic's* owners was as startingly clear as the iceberg which sank it.

While the operators of the Nazareth swimming pool were counting their swimmers they might also have been perusing the many books and manuals published on how to protect swimmers from drowning or serious bodily injury. Adam Shekletski, the defendant's park manager, testified that he knew what the safe depth should be in the swimming pool and, therefore, never consulted literature published by responsible authorities on the subject.

Donald A. Stier, councilman of the borough and chairman of the property committee of the borough and of the Nazareth pool and park, testified that he had never had any training in water safety and that while he knew the one-meter board was not suspended over the deepest part of the pool, he never made inquiry or suggested any test to determine whether this placement might endanger the safety of swimmers.

The head lifeguard at the Nazareth pool said he did not know the actual depth of the water under the one-meter board and was unfamiliar with the minimum standard depth requirement under such a diving board as recommended by the Y.M.C.A., Official Collegiate Scholastic Swimming Guide, American Public Health Association, National Pool Institute, the A.A.U., the Southeastern Swimming Pool Association and the United States Department of Health.

Only a few feet away from the board from which Darrel dived, the water was 7 ft. 10 3/4 inches deep. Darrel's tragic mishap might have been averted if the board had been moved to a point proximate to this greater depth. The accident might also have been

averted if the operators of the pool had placed a sign over the Darrel board, warning swimmers that this was not the deepest part of the pool.

Joseph Frederick Cook, Jr., a university-graduated architect, testified that he had designed 8 or 10 swimming pools and that he was familiar with the custom, usage and design respecting depth requirements of water under one-meter boards. He declared unequivocally that the minimum depth requirement was 9 feet and that, in addition, there was a custom and usage in the industry to provide a "well" under a one-meter board. He defined a "well" as a "large saucer in the bottom of the pool." He stated there was no such well in the Nazareth pool.

Another swimming pool expert, Robert Clotworthy, testified that the minimum depth requirement under a one-meter board was, prior to 1935 (the date of the construction of the pool), 9 feet and that subsequent to 1935 the minimum ranged from 8 to 12 feet, depending on the type of the pool.

A third expert, William Lawson, swimming and diving coach at Lafayette College, testified that he had been teaching water safety since 1956 and that, prior to 1935, custom and usage dictated a minimum depth of 8 1/2 feet under a one-meter board, and that, subsequent to 1935, the minimum requirement was increased to 10 feet.

The defendant borough presented no expert testimony to refute what the plaintiff's experts had declared from the witness stand.

On all this evidence, the jury was well justified in concluding that the Nazareth swimming pool was not constructed or, at least, not operated to provide Darrel with the reasonable care which was due him as a business visitor. Section 434(2) of Restatement 2d, Torts, declares: "It is the function of the jury to determine, in any case in which it may reasonably differ

on the issue, (a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, . . ."

The court below properly said that a municipality is not an insurer of the safety of patrons but owes them only the duty of reasonable care. (*Amon v. Shemaka,* 419 Pa. 314). The court went on then to say, however, that there was no proof that the defendant did not exercise reasonable care. But it was a question of fact for the jury to determine whether the defendant had not failed in manifesting reasonable care when it did not place the one-meter board over the deepest part of the pool, when it did not post a warning sign over the one-meter board, when it did not fill the pool to the level of the scum gutter, and when it did not familiarize itself with the many manuals specifying the required depth under one-meter boards.

The lower court said that, even if the defendant was proved guilty of negligence, the plaintiff, Darrel, could not recover because he had voluntarily assumed the risk of diving where he did. In pressing this theory the court dives into waters of logic scarcely deep enough to float the argument. It says that the managers of the pool could not know any danger was involved in diving from the one-meter pool because a half million swimmers had cavorted in and around the meter board without a single casualty. Yet the court proceeds to indict Darrel on assumption of risk because the danger was obvious!

In order to charge successfully the plaintiff with voluntary assumption of risk, the evidence of the danger must be glaringly obvious or patent. (*Stark v. Lehigh Foundries, Inc.,* 388 Pa. 1). The short distance to the bottom of the pool from the one-meter board was not glaringly obvious. Indeed the entire outer appearance of the pool would have Darrel believe that the water was deep enough to absorb the velocity of his

dive, allowing sufficient space underwater for him to straighten out and resurface.

If the park manager and two of the lifeguards had no knowledge of the inadequate water under the one-meter board, certainly Darrel could not be charged with that knowledge.

The court cited the case of *Schentzel v. Philadelphia National League Club,* 173 Pa. Superior Ct. 179, where the Court held that a patron who was struck by a foul ball at a ball game, could not recover because he knew that at a ball game it was not extraordinary for a foul ball to enter the grandstand. There is no analogy between the dangers of a baseball game and those attendant upon a swimmer in a pool. The baseball fan knows that foul balls are a routine part of the game. Indeed foul balls are counted as strikes except when the batter already has two strikes. The baseball fan knows that foul balls often fly into or over the grandstand and that if a player of the opposite side catches the ball before it falls to the ground, this automatically retires the batter. But there is nothing routine about striking one's head on the bottom of a swimming pool. This was an unforeseen, unanticipated event which the swimmer could not fend against.

The lower court makes much of the fact that Darrel had swum in this pool for five years and had used the diving board over a period of two or three years. This, in itself, means very little. Darrel was never injured in diving, he never saw anybody else so injured, nor had he ever heard of such an accident. The record is as empty as a drum that Darrel had any reason to assume he was taking any risk when he dived from the one-meter board.

Having faulted the plaintiff in declaring that he had failed to prove negligence on the part of the defendant, and that he was guilty of assuming the risk, the trial court then, in almost an aside, says in a foot-

note that "there is a complete absence of express evidence that Darrel struck the bottom of the pool." This is like arguing that General Lee won the battle of Gettysburg and then ending up the argument by declaring that the battle was never really fought. If the evidence did not show that Darrel struck the bottom of the pool, that, of course, would have ended the case and it would not have been necessary for the court to go into the many propositions it submits in its opinion.

In his testimony-in-chief Darrel said: "Then after brushing against John and going down further, all of a sudden it felt like a sledge hammer hit me and I was out . . . after brushing Johnny, I remember just a little bit after that still going down in the water. Then all of a sudden, pow: Just like that, I was out."

John was the youth who had brought Darrel to the surface after he found him on the floor of the pool. John was treading water at the time Darrel went by, but there is not a scintilla of evidence which would suggest in the remotest degree that this trivial touching of the bodies had anything to do with Darrel's injuries. John testified: "Q. The fact that Darrel Cummings brushed against you, did it in any way disturb your treading the water? A. No, it didn't harm me. Q. Did you feel any pain as a result of it? A. I felt it, but there was no pain, no discomfort."

The lower court's argument that this transitory touching of the bodies broke Darrel's back does not hold together any more than water which is thrown from a dishpan. The whole case is based on the proposition that Darrel collided with the bottom of the pool. That proof does not need to be direct. "It is not necessary to prove the cause of the accident by direct evidence; testimony that supports inferences which may reasonably be drawn by the jury is sufficient." (*Foley v. Pittsburgh-Des Moines Co.*, 363 Pa. 1, 4.)

Dr. Rolf Johnson testified: "The patient had a severe blow on the head causing the head to be flexed forward violently. It would have to be quite severe to crush the vertebra and also to cause the subluxation. . . . Q. Now, Doctor, could such a trauma come from a collision with another swimmer? A. It's possible. Highly unlikely. Q. And why is that, Doctor? A. Well, because the other swimmer has a soft body and there will be a certain amount of give, and the force required to give a fracture dislocation of the neck, you have to have a sudden stop, an impact. It would be like an automobile accident."

Dr. Hugo C. J. Verbruggen was asked if it was possible for Darrel to have sustained his serious injuries "by colliding with another swimmer who is **treading** water?" He replied: "It is impossible."

He said further: "On the description given by Mr. Milides, it would seem that the contact with the swimmer was nothing more than just a glancing contact, and that if one remembers being struck by a sledgehammer, this would mean that the swimmer had been in contact with a solid and stationary object, such as the floor." The trial court itself admitted during the trial that there was evidence supporting the floor-head-banging episode. In his charge to the jury, the judge said: "and the plaintiffs' theory of the case, as I understand it, is that Darrel struck his head on the bottom of the pool . . . From it you might infer that he had struck the bottom . . . Well, these and other questions of fact, members of the jury, are solely for you."

The rendering of a judgment n.o.v. is a drastic act because it overturns the findings of a jury, the fact-finding tribunal in our procedure. Judgment n.o.v. should be entered only when the facts are such that no two reasonable persons could fail to agree that the

verdict was improper. It would be hyperbole stretched to the bursting point to say that in this case no two reasonable persons could agree that the plaintiff had not made out his case.

We find that the jury's verdict was entirely justified by the evidence and that a question about the weight of evidence could well have arisen had they decided that the defendant had done its duty in providing a safe place for its patrons at the swimming pool.

The court below did not pass upon the defendant's motion for a new trial because of its entering judgment n.o.v. The record is now remanded for disposition of the motion for a new trial, with direction that if the motion for a new trial is refused, the verdicts of the jury are to be reinstated and judgments entered thereon.

Reversed and remanded.

Mr. Justice COHEN took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:
I dissent.

The minor plaintiff was semi-paralyzed as the result of diving in defendant's swimming pool. Anyone who is badly hurt deserves our sympathies, but that is not and should not be sufficient to justify a verdict which is contrary to the evidence or the law, or both. In this case it was contrary to both.

The lower Court correctly summarized the pertinent facts as follows: "He was athletically inclined and wrestled during his sophomore year. He swam in defendant's pool during the summers of 1959, 1960, 1961, 1962 and 1963, until the date of the accident [on July 30, 1963]. During the summers of 1961, 1962 and 1963 Darrel used both the one-meter diving board and the diving tower which was 11 feet high. Darrel used the

pool *at least 20 times** per summer and for the past two or three summers *used the diving board approximately 8 or 10 times per day.* He performed various dives, including a 'running front dive,' a 'cannon ball' and 'can opener' which he described as more of a splash than a dive, a 'sloppy swan' and a 'kamikaze' in which the diver enters the water head first with arms outstretched in a horizontal manner in imitation of the wings of a descending airplane."

Furthermore, as the Majority admit: "The Borough of Nazareth employed at least four lifeguards, able, ready and eager at all times to speed to those who falter or weaken in the water, or have any reason at all to need natatorial assistance."

## 1. Judgment N. O. V.

It is crystal clear (a) that plaintiff, an exceptionally experienced diver, undoubtedly should have been and actually was aware of the risks that he and every other diver took in this pool with which he was so familiar, and (b) that he voluntarily assumed the risk of injury from diving off this board which he had done myriad times before in this very pool and for these reasons cannot recover. *Podvin v. Somerton Springs Swim Club,* 406 Pa. 384, 178 A. 2d 615; *Schentzel v. Philadelphia National League Club,* 173 Pa. Superior Ct. 179, 96 A. 2d 181; *Amon v. Shemaka,* 419 Pa. 314, 214 A. 2d 238; *Rauch v. Pa. Sports and Enterprises, Inc.,* 367 Pa. 632, 81 A. 2d 548.

In *Schentzel v. Philadelphia National League Club,* 173 Pa. Superior Ct., supra, the Court aptly, pertinently and relevantly said (pages 186-187) : "We quote at length from Prosser on Torts at pages 383-384: 'By entering freely and voluntarily into any relation or

---

* Italics throughout, ours.

situation which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself, and relieve the defendant of responsibility. Those who participate [in] or sit as spectators at sports and amusements assume all the obvious risks of being hurt by roller coasters, flying balls, [Kavafian v. Seattle Baseball Club Ass'n, 105 Wash. 215, 177 P. 776; Brisson v. Minneapolis Baseball & Athletic Ass'n, 185 Minn. 507, 240 N.W. 903 (baseball); Schlenger v. Weinberg, 107 N.J.L. 130, 150 A. 434, 69 A.L.R. 738 (golf); Douglas v. Converse, 248 Pa. 232, 93 A. 955 (polo); Ingersoll v. Onondaga Hockey Club, 245 App. Div. 137, 281 N.Y.S. 505 (hockey)], fireworks explosions, or the struggles of the contestants. "The timorous may stay at home." [CARDOZO, C. J., in Murphy v. Steeplechase Amusement Co., 250 N.Y. 479, 166 N.E. 173.]. . . One who enters upon the premises of another, even as a business visitor, assumes the danger of all known or obvious conditions which he finds there. The consent is found in going ahead with full knowledge of the risk.'" (Italics omitted)

It is, we repeat, clear as crystal that the minor plaintiff is barred from any recovery, because he voluntarily assumed the risk of injury from diving in this, his "home," pool and the lower Court properly entered judgment n.o.v.

## 2. New Trial

If the judgment n.o.v. is not affirmed, then I would grant a new trial because the verdict was so clearly and unquestionably against the overwhelming weight of the evidence. The evidence most strongly relied upon by the appellees was the opinion evidence of two "swimming pool experts" as to the proper construction of *this and every other swimming pool.* Their testi-

mony is so contrary to the actual facts in the instant case—5,000 dives without injury—as well as to the common knowledge of every layman who ever swam in private or public pools, as to be entitled to little or no weight. The law is well settled that an opinion of an expert is entitled to little weight as against actual facts: *Girsh Trust*, 410 Pa. 455, 189 A. 2d 852; *Sommerville Will*, 406 Pa. 207, 177 A. 2d 496; *Kadilak Will*, 405 Pa. 238, 174 A. 2d 870. Cf. also *Richette v. Pennsylvania R.R.*, 410 Pa. 6, 187 A. 2d 910; *Commonwealth v. Ahearn*, 421 Pa. 311, 323, 218 A. 2d 561; *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A. 2d 98.

In *Girsh Trust*, 410 Pa., supra, the Court aptly said (page 471): ". . . 'opinion evidence is generally considered of a low grade, and not entitled to much weight against positive testimony of actual facts' . . ."

This Court has the power to remand the record to the Court below with directions to consider defendant's motion for a new trial, or this Court itself can grant a new trial: *Clewell v. Pummer*, 388 Pa. 592, 600, 131 A. 2d 375; *Downes v. Hodin*, 377 Pa. 208, 104 A. 2d 495; *Richette v. Pennsylvania R.R.*, 410 Pa., supra; Act of May 20, 1891, §2, P. L. 101.

If the judgment n.o.v. is not affirmed, I would grant a new trial for the reasons above set forth.

### 3. Remand

If the judgment n.o.v. is not affirmed, and if this Court does not grant a new trial, then I would remand the case to the lower Court to dispose of defendant's motion for a new trial.