568 A.2d 931

**Edward J. MARSHALL, Appellant,**

v.

**PORT AUTHORITY OF ALLEGHENY COUNTY, and Michael Baker, Jr., Inc., Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 26, 1988.

Decided Jan. 17, 1990.

Reargument Denied March 12, 1990 *.

* Nix, C.J., did not participate in this case.

1

Edward J. Balzarini, Balzarini, Carey & Watson, Pittsburgh, for appellant.

W. Arch Irvin, Jr., Francis X. McTiernan, Jr., Wayman, Irvin & McAuley, Pittsburgh, for Michael Baker, Jr., Inc.

Louis C. Long, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, for Port Authority of Allegheny County.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

FLAHERTY*, Justice.

This is an appeal, by allowance, from an order of the Commonwealth Court which reversed a judgment entered by the Court of Common Pleas of Allegheny County. *Marshall v. Port Authority of Allegheny County*, 106 Pa. Commw.Ct. 131, 525 A.2d 857 (1987). In the Court of Common Pleas the appellees herein, the Port Authority of Allegheny County (PAT) and Michael Baker, Jr., Inc. (Baker), were held jointly and severally liable for injuries sustained by the appellant, Edward J. Marshall. The injuries were sustained in 1981 when appellant, an employee of the Mosites Construction Company (Mosites), was performing demolition work on a railway bridge that had been acquired by PAT. Mosites had been engaged by PAT to demolish the bridge in connection with the construction of a busway. Baker had been engaged to provide certain engineering and other services for the project. The accident occurred as appellant stepped onto a bridge beam, which, unbeknownst to him, had been cut with a torch. The beam collapsed, causing him to fall to the ground and suffer permanent injuries.

In 1982 appellant brought the present action against PAT, alleging negligence by PAT and vicarious liability for negligent conduct of Mosites, and against Baker, alleging negligence in its supervision of Mosites. At trial, a verdict was returned finding PAT seventy percent liable, Baker twenty percent liable, and appellant ten percent contribu-

* This case was reassigned to this writer.

torily negligent. Damages in the sum of $800,000.00 were awarded.[1]

On appeal, the Commonwealth Court reversed, holding that PAT is a "local agency" insulated from liability under the governmental immunity statute, 42 Pa.C.S. § 8541. The primary issue to be addressed in this appeal is whether PAT is entitled to immunity. We affirm that PAT is immune from suit, but upon different statutory grounds, to wit, that PAT is an agency of the Commonwealth protected from liability under the sovereign immunity statute, 42 Pa.C.S. § 8522.[2]

In its amended pleadings, PAT claimed immunity as an "agency of the Commonwealth," thereby invoking sovereign immunity as a bar to liability. The Pennsylvania sovereign immunity statute provides:

(a) Liability imposed.—The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against *Commonwealth parties,* for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

42 Pa.C.S. § 8522(a) (emphasis added).

Clearly, PAT may claim sovereign immunity if it is a "Commonwealth party." A "Commonwealth party" is defined in 42 Pa.C.S. § 8501 as "[a] Commonwealth agency and any employee thereof...." Under 42 Pa.C.S. § 102,

1. Such remedies against Mosites as may be available to appellant under workmen's compensation law are not involved in this appeal.

2. We do not address appellant's contention that PAT failed to adequately plead immunity as a "local agency," under the governmental immunity statute, supra, inasmuch as we find PAT to be protected by sovereign immunity.

"Commonwealth agency" is defined as "[a]ny executive agency or independent agency." Agencies are classified as "executive" if they are under the supervision and control of the Governor, and, if they are not, as "independent." *Id.* Both of these types of agencies are expressly defined as including entities such as boards, commissions, authorities, and other agencies "of the Commonwealth government." *Id.* "Commonwealth government" is, in turn, defined as encompassing the following:

> ... the departments, boards, commissions, authorities and officers and *agencies of the Commonwealth,* but the term does not include any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or local authority.

42 Pa.C.S. § 102 (emphasis added). The question presented, therefore, is whether PAT is an "agency of the Commonwealth," rather than one of the types of local agencies excluded from the definition of "Commonwealth government." If PAT is an "agency of the Commonwealth," it is plainly a "Commonwealth party" entitled to immunity under 42 Pa.C.S. § 8522(a), supra.

Express statutory language contained in the legislation which created PAT makes it eminently clear that PAT is an agency of the Commonwealth. PAT's genesis lies in the Second Class County Port Authority Act, 55 P.S. § 553(a), which provides:

> There are hereby created bodies corporate and politic in counties of the second class, to be known as Port Authority of (insert name of county), which shall constitute public bodies corporate and politic; exercising the public powers of the *Commonwealth as an agency thereof.*

(Emphasis added). In view of this plain statutory language, it would be impossible to conclude that PAT is anything other than an agency of the Commonwealth. PAT was created by the Commonwealth, rather than by local government, and acts as an agency of the Commonwealth (even though PAT's Board is appointed by county commissioners pursuant to 55 P.S. § 556). See also *Feingold v. Southeast-*

*ern Pennsylvania Transportation Authority,* 512 Pa. 567, 517 A.2d 1270 (1968) (holding that the Southeastern Pennsylvania Transportation Authority (SEPTA) is an agency of the Commonwealth for liability purposes, where the relevant enabling statute provided, in part, that SEPTA shall "exercise the public powers of the Commonwealth as an agency and instrumentality thereof."). As an agency of the Commonwealth, PAT is entitled to the protection of sovereign immunity.

Appellant has asserted that, despite the clear import of the statutory immunity provisions, the legislature did not intend when it enacted the sovereign immunity provisions in 1978 and 1980 to confer immunity upon entities which had not been immune from suit prior to our decision abolishing common-law sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). We have repeatedly held, however, that in cases such as the present one where the language of a statute is clear and explicit, consideration of arguments based upon supposed contrary legislative intent or legislative history is improper. *Commonwealth v. Bell,* 512 Pa. 334, 339–40, 516 A.2d 1172, 1175 (1986); *Fisher v. Department of Public Welfare,* 509 Pa. 164, 169, 501 A.2d 617, 619 (1985) (plurality opinion), cert. denied, 479 U.S. 911, 107 S.Ct. 308, 93 L.Ed.2d 283 (1986); *Hellertown Manufacturing Co. v. Commonwealth,* 480 Pa. 358, 365, 390 A.2d 732, 735 (1978); *Davis v. Sulcowe,* 416 Pa. 138, 143–44, 205 A.2d 89, 91–92 (1964). See also 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). The best indicium of legislative intent regarding the scope of sovereign immunity is the plain language employed in the statute, and we are constrained to give effect to that language. See *Toombs v. Manning,* 835 F.2d 453, 459 (3rd Cir.1987) (holding that SEPTA is protected by the Pennsylvania sovereign immunity statute, and that the scope of sovereign immunity is governed by express statutory provisions and is not dependent upon whether entities now

immune from suit were protected from liability prior to the decision in *Mayle,* supra).

Having determined that PAT is protected by sovereign immunity, we turn to a consideration of whether the acts underlying appellant's cause of action are encompassed by any of the exceptions to immunity set forth in the statute. See 42 Pa.C.S. § 8522(b) (exceptions enumerated).[3] Although appellant has argued that PAT does not fall within the general ambit of the immunity statute, appellant has *not* specifically argued in this appeal that any of the exceptions to immunity are applicable. Indeed, the only exception of conceivable relevance is the one pertaining to injuries caused by dangerous conditions upon the real property of Commonwealth agencies:

(b) Acts which may impose liability.—The following acts *by a Commonwealth party* may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

. . . .

(4) Commonwealth real estate, highways and sidewalks.—A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph (5) [relating to potholes].

42 Pa.C.S. § 8522(b) (emphasis added).

We have held that the real property exception must be strictly and narrowly construed, because the legislature intended to exempt Commonwealth parties from immunity only in limited situations. *Snyder v. Harmon,* 522 Pa. 424,

**3.** The exceptions pertain to the following: operation of motor vehicles; acts of health care personnel; care or control of personal property; dangerous conditions of real estate; potholes in highways; care or control of animals; liquor store sales; National Guard activities; and use of toxoids or vaccines.

562 A.2d 307, 311–12 (1989). See also 42 Pa.C.S. § 8522(a), supra (immunity to be waived "in the instances set forth in subsection (b) only and only to the extent set forth...."). The exceptions provided in the statute expressly contemplate acts "by a Commonwealth party" as providing the requisite basis for liability. The acts must be ones of negligence. 42 Pa.C.S. § 8522(a), supra. Mosites' negligence in allowing appellant to step onto a beam that had been cut with a torch was the action that caused appellant's injury. There was no action, however, *by a Commonwealth party* that contributed to appellant's injury. As discussed supra, "Commonwealth party" is defined in 42 Pa.C.S. § 8501 as "[a] Commonwealth agency and any employee thereof...." Plainly, independent contractors, such as Mosites, performing work for Commonwealth agencies are not employees of the agencies, and, thus, do not constitute Commonwealth parties.

■ Further, the only Commonwealth party involved in this case, PAT, was *expressly* found by the jury to have been *not* negligent. The verdict against PAT rested solely upon vicarious liability for negligence of the general contractor, Mosites, on grounds that Mosites was engaged in inherently dangerous work. See generally *Philadelphia Electric Co. v. James Julian, Inc.*, 425 Pa. 217, 228 A.2d 669 (1967) (adopting Restatement (Second) of Torts §§ 416, 427 (pertaining to vicarious liability for actions of independent contractors engaged in inherently dangerous work)).

We need not further address the scope of the real estate exception's possible application, or the scope of vicarious liability under the facts presented, for, where there has been no negligent act by a Commonwealth party, there is no basis for applying any of the exceptions to sovereign immunity. PAT is protected by that immunity, and the judgment entered against PAT by the Court of Common Pleas was, therefore, improper.

■ The next issue presented in this appeal is whether the Commonwealth Court erred in reversing the judgment

entered against the engineering firm, Baker. The basis for the Commonwealth Court's decision was that, under the contract between PAT and Baker, there was no duty for Baker to discover or correct safety hazards posed by Mosites' operations. Hence, the judgment, which rested on grounds that Baker was negligent in its supervision of safety requirements, could not be sustained. We agree.

Absent a breach of duty, a negligence claim cannot be sustained. *Morena v. South Hills Health System*, 501 Pa. 634, 642, 462 A.2d 680 (1983). The contract between Baker and PAT, specifying Baker's duties in connection with the construction of PAT's busway, consisted of an initial agreement and a number of supplemental agreements. The initial agreement imposed duties with regard to planning, design, engineering, and construction management. In connection with construction management Baker was expressly charged with "[r]eviewing contractors' practices and procedures to minimize hazards associated with construction operations." This duty and all other construction management duties were, however, expressly eliminated in a subsequently entered agreement, Supplemental Agreement No. 4. The issue presented is whether yet another subsequent agreement, Supplemental Agreement No. 6, reinstated the duty to supervise jobsite safety procedures. It was this latter agreement that was in effect at the time of appellant's accident. Supplemental Agreement No. 6 provides for "engineering management of the construction phase" and states in Section B(1) that Baker shall:

> B(1) Provide field engineers, inspectors and support personnel to monitor the construction performed under Authority issued contracts, *to assure delivery of the specified systems and facilities in accordance with contract drawings and specifications.*

(Emphasis added).

The contract specifications referred to in Agreement No. 6 are those governing the agreement between PAT and the contractor, Mosites. The PAT–Mosites agreement contained a section denoted as "Safety and First Aid Require-

ments," which stated that the contractor would not require laborers to work under conditions that posed dangers to their safety as determined by standards promulgated under the federal Occupational Safety and Health Act of 1970 (OSHA). General Provision 4.11.1. The agreement further provided that, in the event Mosites failed to comply with such standards, where "such failure create[s] a hazard to life, limb or property, the Engineer *may* stop any operation of the Contractor affected by the failure until the failure is remedied." General Provision 4.11.5 (emphasis added). Clearly, under the PAT–Mosites agreement, the engineering firm, Baker, was *permitted* to take action against perceived safety hazards. Although this authority was given to Baker, the PAT–Mosites contract also provided that Mosites "shall supervise and direct" the work and "be solely responsible for all construction means, methods, techniques, sequences and procedures...." General Provision 6.4.1. The determinative question is not, however, whether Baker *could* have acted to prevent the instant accident, but rather whether it had a *duty* to do so.

The PAT–Mosites contract obviously cannot impose a duty upon Baker, for Baker was not a party to the contract. See *Cumberland–Perry Area Vocational–Technical School Authority v. Bogar & Bink,* 261 Pa.Super. 350, 354, 396 A.2d 433, 435 (1978) (contract cannot legally bind persons not party thereto). Hence, even if the contract had contained language requiring rather than merely permitting Baker to stop the contractor's operations, Baker would not have been bound thereby.

Appellant alleges that Baker's duty can be ascribed to the PAT–Baker contract, specifically Section B(1) of Supplemental Agreement No. 6, supra. Due to Baker's obligation thereunder to "monitor the construction ... to assure delivery of the specified systems and facilities in accordance with contract drawings and specifications," it is claimed that the earlier described provisions, regarding safety, in the PAT–Mosites contract were to be monitored by Baker. We do not agree.

Viewed in context, with reference to the provisions of the contract between PAT and Mosites, the PAT–Baker contract must be understood as imposing a duty upon Baker to assure that the finished product for which PAT bargained would comply with the design drawings and specifications. See *International Organization Master, Mates, etc. v. International Organization Master, Mates & Pilots, Inc.*, 497 Pa. 102, 110, 439 A.2d 621, 625 (1981) (when construing a contract which by necessary implication refers to another document, the other document may be looked to for evidence of surrounding circumstances in an effort to ascertain the intention of the parties). Baker's obligation under its contract with PAT was to "assure delivery," see Section B(1) supra, of a completed project that met PAT's specifications. To hold otherwise, by imposing a duty on Baker to be actively involved in procedures for safety compliance, would be inconsistent with the provision in the PAT–Mosites contract stating that Mosites "shall supervise and direct" the work and be *"solely* responsible for all construction means...." (Emphasis added).

Further, it is settled that the various provisions of a contract are to be construed together, so as to ascertain the intention of the parties from the entire instrument. *Foulke v. Miller*, 381 Pa. 587, 593, 112 A.2d 124, 127 (1955). One of the other provisions in the PAT–Baker contract indicates that Baker's duties pertaining to jobsite safety were to be passive in nature, not involving a duty to continually oversee the jobsite and seek out safety hazards. It is provided in Section B(16) of Supplemental Agreement No. 6 that Baker shall:

B(16) Require contractors to provide written safety program coordinated as to all prime and subcontractors working on a site and obtain periodic reports from the contractors as to implementation of the program, and provide copies to the Authority.

To no extent did Baker incur a duty to actively inspect jobsite safety procedures through its contractual obligation to merely obtain, and forward to PAT, periodic reports from Mosites regarding implementation of the contractor's safety

program. Section B(16) clearly contemplated that Baker's involvement with safety concerns would be of an indirect sort, requiring contractors to furnish certain paperwork and forwarding that paperwork to PAT, rather than being an on-site inspector. This duty is plainly of a lesser sort than that in the *original* PAT–Baker contract which, prior to its modification by Supplemental Agreement No. 4, required Baker to review "contractors' practices and procedures to minimize hazards associated with construction operations."

Supplemental Agreement No. 6 cannot, therefore, be viewed as allocating to Baker a duty to seek out or take action against jobsite safety hazards. The Commonwealth Court properly determined that, inasmuch as such a duty was lacking, the judgment against Baker could not stand. Having determined that the judgments against PAT and Baker were properly reversed by the Commonwealth Court, we affirm.

Order affirmed.

NIX, C.J., and STOUT, former J., did not participate in the decision of this case.

PAPADAKOS, J., files a dissenting opinion, which is joined by LARSEN, J.

PAPADAKOS, Justice, dissenting.

While I agree with the Majority that PAT is a "Commonwealth agency," albeit for slightly different reasons, I do not believe that PAT is protected by sovereign immunity here and I conclude that the majority is wrong, not only in affirming the Commonwealth Court reversal of the judgment entered against PAT herein, but that the majority is also wrong in affirming the Commonwealth Court reversal of the judgment entered against Appellee Baker. Hence, I dissent.

Before addressing the issue of whether PAT is entitled to sovereign or governmental immunity, a brief explanation of the history of immunity doctrines in this Commonwealth must be undertaken. Traditionally, our courts determined that the Commonwealth, as sovereign, could not be sued

against its consent. *Monongahela Navigation Co. v. Coons*, 6 Watts & S. 101 (Pa.1843). Local units of government also historically enjoyed court created immunity from tort liability. Apparently originating in the English case of *Russell v. Men of Devon*, 100 Eng.Rep. 369 (K.B.1788), the doctrine was adopted in this Commonwealth at least by 1888. See, *Ford v. Kendall Borough School District*, 121 Pa. 543, 15 A. 812 (1888). The immunity of local government units, however, was not absolute. Liability existed for failure to maintain roads, bridges, and sidewalks; in actions based upon improper management and use of municipal property; and in cases in which the function was determined to be "proprietary" as opposed to "governmental." See, *e.g.*, *Shields v. Pittsburgh School District*, 408 Pa. 388, 184 A.2d 240 (1962). The distinction between those local units of government to which the governmental/proprietary concept applied and the Commonwealth was not enunciated as "governmental immunity" versus "sovereign immunity" until this Court's decisions in *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973), and *Brown v. Commonwealth*, 453 Pa. 566, 305 A.2d 868 (1973). In *Ayala* we abrogated governmental immunity, but in *Brown*, we retained (albeit temporarily) the doctrine of sovereign immunity. Subsequent to these two cases, our courts ruled that such local governmental units as boards of education, townships, counties and cities, were no longer immune from liability. See, *Kitchen v. Wilkinsburg School District*, 455 Pa. 633, 306 A.2d 294 (1973); *Klein v. Cheltenham Township*, 309 A.2d 353 (Pa.1973); *Edwell v. Allegheny County*, 226 Pa. Superior Ct. 429, 310 A.2d 340 (1973); *Laughlin v. Pittsburgh*, 226 Pa. Superior Ct. 431, 310 A.2d 289 (1973). *Brown*, which retained "sovereign immunity," was followed in suits against Commonwealth employees, Departments, Boards, Commissions, and Colleges. See, *Hall v. Power*, 455 Pa. 645, 311 A.2d 612 (1973) (employee) *aff'g.*, 6 Pa. Commonwealth Ct. 544, 296 A.2d 535 (1972); *Sweigard v. Pa. Dept. of Transportation*, 454 Pa. 32, 309 A.2d 374 (1973); *Koynok v. Commonwealth*, 12 Pa. Commonwealth Ct. 375, 316 A.2d 118 (1974)

(State Board of Private Academic Schools); *Kreider v. Commonwealth,* 9 Pa. Commonwealth Ct. 491, 308 A.2d 642 (1973) (Pa. Human Relations Commission); *Brungard v. Hartman,* 12 Pa. Commonwealth Ct. 477, 315 A.2d 913 (1974) (Mansfield State College). Finally, in 1978, this Court overruled *Brown* and abolished sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). Subsequent to *Mayle,* the legislature enacted a limited statutory immunity scheme, which included a sovereign immunity statute, on September 28, 1978. In November of 1978, they enacted governmental immunity statutes, 42 Pa.C.S. §§ 8521–8528 and §§ 8541–8564, respectively. These acts were repealed and re-enacted on October 5, 1980. The 1980 Act included a sovereign immunity provision and a governmental immunity provision, 42 Pa.C.S. §§ 8501–8564. The 1980 provisions are virtually identical in substance to the 1978 Acts. These statutes recreated the immunity that some Commonwealth and local entities had enjoyed prior to abrogation of common-law immunity, but allowed the recovery of compensatory damages in certain enumerated situations.

The 1980 Immunity Act, at 42 Pa.C.S. § 8501, contains, *inter alia,* the following relevant definitions:

"Commonwealth party." A Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment.

"Local agency." A government unit other than the Commonwealth government. The term includes an intermediate unit.

Sovereign immunity is waived with respect to a Commonwealth party (including by definition, a Commonwealth agency) at 42 Pa.C.S. § 8522 as follows:

(a) Liability imposed. The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for

damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

Subsection (b) spells out those acts which may impose liability.

Governmental immunity is established at 42 Pa.C.S.A. § 8541:

Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

The exceptions to governmental immunity are set forth at 42 Pa.C.S.A. § 8542.

In the instant case against PAT, the Commonwealth Court held that PAT is a "local agency" for purposes of the 1980 Immunity Act, 42 Pa.C.S.A. § 8541. I agree that this conclusion is wrong.

Section 3(a) of the Second Class County Port Authority Act, 55 P.S. § 553(a), expressly creates PAT as an Authority and public body corporate and politic, "exercising the public powers of the Commonwealth as an agency thereof." Hence, it cannot be maintained that PAT is a "local agency." PAT is not a creation of the County government but is a creature of the Commonwealth itself (even though, as the Majority notes, PAT's Board is appointed by the County Commissioners under 55 P.S. § 556). This must be so under the municipal corporation law of our state. In *In re: Municipal Authority of the Township of Upper St. Clair (Simon's Appeal)*, 408 Pa. 464, 184 A.2d 695 (1962), we explained:

The true nature of a Municipality Authority is that which is set forth in the earliest cases of this Court involving this type of public corporation. Section 2 of the Municipality Authority Act of 1945 (53 P.S. § 302(a)), defines the term "Authority" as meaning "A body politic and corporate, created pursuant to this act or pursuant to the

'Municipality Authorities Act of 1935' repealed hereby." It has been consistently held in cases in point, both under the Municipality Authorities Act of 1935 and 1945 and under other legislation involving authorities that an authority is not the creature, agent or representative of the municipality organizing it. In *Tranter v. Allegheny County Authority*, 316 Pa. 65, 79, 173 A. 289, 295 (1934), this Court refers to the Authority "as the agent created for the purpose *by the state*" (Emphasis supplied), notwithstanding the fact that under the Second Class County Authority Act the Authority therein provided for would not come into being until the county commissioners so declared. In *Williams v. Samuel*, 332 Pa. 265, 277, 2 A.2d 834, 840 (1938), this Court commented that as to an Authority "the state can authorize its creature, the City, to transfer its sewer system to the Authority *created by the state.*" (Emphasis supplied)....

Similarly, in *Evans v. West Norriton Township Municipal Authority*, 370 Pa. 150, at page 154, 87 A.2d 474 at page 476 (1952), Mr. Justice (now Chief Justice) Bell of this Court stated that: "A Municipal Authority is defined by the Act as a 'body politic and corporate'. Its members are appointed by elected public officials. It receives a charter from the Commonwealth of Pennsylvania *which grants it certain characteristic attributes* of a corporation. It is authorized by law and by its charter to perform vast private as well as certain limited public functions." (Emphasis supplied).

Much unnecessary confusion has been injected into this field in past years, apparently on the erroneous impression that an Authority is merely the child or instrumentality of the municipality incorporating it, under the authority of such isolated and unfortunate expressions as set forth in *State College Borough Authority v. Pennsylvania Public Utility Commission*, 152 Pa.Super. 363, 369, 370, 31 A.2d 557 (1943); *Wilson v. Upper Moreland–Hatboro Joint Sewer Authority*, 183 Pa.Super. 588, 594, 132 A.2d 909 (1957); and in the opinion of the Attorney General under the caption *In re Municipal Authorities,*

43 Pa.Dist. & Co. R. 12, 16 (1941). It is quite clear to us that the fundamental premise as to the nature of an Authority and as to the construction of the Municipality Authorities Act of 1945, as amended, on this point has been properly set forth and established by the line of cases first recited herein, in detail, beginning with the *Tranter* case....

Keeping clearly in mind the fundamental nature of an Authority as a corporate agency of the state, and not the child of a municipality, let us next look at the nature of the power of assessment, as exercised by this Authority, and certain corollaries thereto.

184 A.2d at 698–699.

Moreover, constitutionally, such authorities *must* be state created, and they must be separate and distinct entities from the municipalities which compose them. This is to avoid violating Article 3, Section 31 of our Pennsylvania Constitution prohibiting the direct delegation of certain powers (such as the power to make and supervise municipal improvements, to levy taxes, or to perform municipal functions) to any special commission, private corporation or association. *Lighton v. Abington Township,* 336 Pa. 345, 9 A.2d 609 (1939). Not only the plain use of our language, but more importantly, the history of our state municipal corporation law (as summarized above) makes it impossible to see how PAT can be regarded as anything but a Commonwealth agency. I am sympathetic to the argument that municipal authorities have a unique status in our Commonwealth's governmental structure such that they are arguably neither part of the "Commonwealth government" as defined in Section 102 of the Judicial Code, 42 Pa.C.S. § 102,[1] nor are they creatures, agents, or instrumentalities of the local municipalities. Hence, they slip between the cracks and are neither the "Commonwealth government" nor a "local agency." I believe that this argument must be rejected, however, because of the clear *historical view* that Authorities are agencies of the Commonwealth.

1. The term "Commonwealth government" is defined at 42 Pa.C.S. § 102 as follows:

In order to determine whether PAT, as a "Commonwealth agency" is entitled to the protection of sovereign immunity under the Act, one would ordinarily seek to determine whether any of the exceptions to sovereign immunity, set forth in 42 Pa.C.S. § 8522, apply. Logically, however, one must first examine the intent of the General Assembly in enacting the 1978 Immunity Act. PAT is a county transportation authority created under the Second Class County Port Authority Act. Its operating rights and powers are set forth in 55 P.S. § 553 [2] which provides in pertinent part:

(a) There are hereby created bodies corporate and politic in counties of the second class, to be known as Port Authority of (insert name of county), which shall constitute public bodies corporate and politic, exercising the public powers of the Commonwealth as an agency thereof....

(b) Each authority is hereby granted ... the following rights and powers: ...

to sue and be sued, implead and be impleaded, complain and defend in all courts ...

55 P.S. § 553(b)(2) and

to self insure or otherwise provide for the insurance of any property or operations of the authority against any risks or hazards.

55 P.S. § 553(b)(22).

PAT was undoubtedly amenable to suit in tort prior to *Ayala* and *Mayle,* see *e.g., Niemiec v. Port Authority of*

The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial system, the General Assembly and its officers and agencies, the Governor, and the departments, boards, commissions, authorities and officers and agencies of the commonwealth, but the term does not include any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or local authority.

2. Act of April 6, 1956, P.L. (1955) 1414, as amended, December 30, 1970, P.L. 953, No. 300, § 3.

The above quoted provisions indicate that PAT is to be subject to suit as any private corporation would be.

*Allegheny County,* 223 Pa. Superior Ct. 435, 302 A.2d 439 (1973) (allocatur denied June 15, 1973). Hence, the question arises as to whether the legislature intended the immunity statutes merely to re-establish the state of immunity that existed prior to *Ayala* and *Mayle,* or whether they were intended to extend the benefits of immunity to agencies like PAT which had not previously enjoyed such protections.

This question was recently addressed by the Third Circuit Court of Appeals in *Toombs v. Manning,* 835 F.2d 453 (3rd Cir.1987). The issue in *Toombs* was the applicability of the immunity act to SEPTA. SEPTA, like PAT, did not enjoy immunity in tort prior to *Ayala* and *Mayle.* The analysis of the *Toombs* court focuses on sovereign immunity and the opinion offers some insight as to the intended scope of the immunity act. The majority concluded that the intent of the General Assembly was not merely to restore the protection of immunity to those entities which had previously been immune, but to extend the protection to those entities not previously immune, but which now come within the scope of the Act. The majority interpreted the statute as creating a statutory scheme which applies uniformly to all Commonwealth agencies. The court relied heavily on *Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270 (1986), to support its holding that SEPTA is a Commonwealth agency within the meaning of the immunity statute. 835 F.2d at 463. The *Toombs* court's reliance on *Feingold,* however, is misplaced as the question of SEPTA's present immune status under the immunity act was not before this Court in that case. After an extensive review of the legislative history of the present Act, the majority was of the opinion that *Mayle* was not the sole motivating force behind the enactment of the immunity act. They believed that the Act was intended to apply to *all* claims against the Commonwealth or its local agencies, except those excluded by the statute itself. Under their broad construction, any entity however remotely connected with the Commonwealth or its political subdivisions would be cloaked with immunity under the Act re-

gardless of its prior status and regardless of whether there is any rational basis for such immune status.

I do not believe that the legislature intended to make such broad sweeping changes nor did it intend to confer sovereign immunity on entities which had not previously been immune from tort liability. A reading of the legislative history is in agreement with that of the *Toombs dissenters*. I am persuaded that the immunity act was a direct reaction to our decisions in *Ayala* and *Mayle*, and as to sovereign immunity was intended to do no more than restore immunity to those entities which had been protected prior to *Mayle*.[3] There is nothing in the legislative history suggesting that the Act was to be applied to transportation authorities. The opening provision of the 1978 Act provides:

> [I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

1 Pa.C.S. § 2310 (emphasis added).

Use of the phrase "shall continue" indicates that the Act was not intended to grant immunity to entities which did not previously enjoy it. Rather, it indicates that the legislature intended to restore immunity to those entities which had been protected by immunity prior to *Ayala* and *Mayle*. PAT did not enjoy immunity prior to those decisions and, in fact, continued to be liable without limitation since the 1978 enactment until the present case.

In my view, the Immunity Act does not extend sovereign immunity to those entities which did not previously enjoy

---

**3.** Section 5 of the 1978 Act specifically provides:
Section 5. Construction and Application
(a) This act is intended to specifically respond to and prescribe the limitations on the decision of *Mayle v. Commonwealth*, decided by the Supreme Court on July 14, 1978.
Act of September 28, 1978, P.L. 788, No. 152, § 5, 42 Pa.C.S. § 8522 (Historical Note).

immunity; the Immunity Act is simply not applicable to this case; and PAT should remain liable in tort just as before the enactment of the Act. Resort to an analysis of the specific exceptions to sovereign immunity spelled out in 42 Pa.C.S. § 8542 would therefore be unnecessary.

As to the question of whether the Commonwealth Court properly reversed the judgment against PAT in favor of Appellant Marshall, it must be noted that two theories of liability were advanced against PAT at trial—that its own negligent conduct caused the injuries; or that the general contractor was negligent and PAT is vicariously liable as one who employs a contractor engaged in inherently dangerous work.[4] The jury found that PAT was not negligent, but found that bridge demolition is an inherently dangerous activity or an activity which is dangerous without special precautions and found that PAT was vicariously liable for the negligence of its contractor.

An analysis of Sections 416 and 427 of the Restatement of Torts, 2d, reveal their applicability to the instant case and establish liability on the part of PAT. As the trial judge noted, the work involved demolition of an old steel railroad bridge, 17 feet above a main thoroughfare. The work was being performed at night under inadequate lighting condi-

---

**4.** This theory is based upon Sections 416 and 427 of the Restatement of Torts, 2d, which provide:

§ 416. Work Dangerous in Absence of Special Precautions.
One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.
§ 427. Negligence as to Danger Inherent in the Work.
One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against danger.
See, *Philadelphia Electric Co. v. James Julian, Inc.*, 425 Pa. 217, 228 A.2d 669 (1967), which adopted these sections as the law of Pennsylvania.

tions, and there was no designated plan as to the sequence in which the beams were to be removed. There was no crane to support the beams during cutting and no lifelines available for the Appellant. Comment (d) to § 416 provides that in order for the rule to apply:

> ... it is not essential that the work which the contractor is employed to do be in itself an extra-hazardous or abnormally dangerous activity, or that it involve a very high degree of risk to those in the vicinity. It is sufficient that it is likely to involve a peculiar risk of physical harm unless special precautions are taken, even though the risk is not abnormally great. A "peculiar risk" is a risk different from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work to be done which calls for special precautions.

Comment (e) further explains that:

> It is not essential that the peculiar risk be one which will necessarily and inevitably arise in the course of the work, no matter how it is done. It is sufficient that it is a risk which the employer should recognize as likely to arise in the course of the ordinary and usual method of doing the work, or the particular method which the employer knows that the contractor will adopt.

It is clear that Section 416 is applicable only to situations in which the negligence of the independent contractor consists of the failure to take the precautions necessary for the safe performance of a task.

Further, Section 416 imposes liability upon an employer regardless of control, under the theory that an employer hiring an independent contractor to do particularly dangerous work should not be permitted to insulate himself from liability. The facts of this case preclude a determination as a matter of law that the work was not inherently dangerous or dangerous in the absence of special precautions. Therefore, the issue was properly left to the jury in my view.

I would reverse the order of the Commonwealth Court and reinstate the Appellant's judgment against the Port Authority. However, I would remand the case to the Commonwealth Court for consideration of the remaining issues raised by PAT on appeal but not addressed by Commonwealth Court because of its holding on the immunity issue.

Finally, I disagree with the Majority's conclusion that the Commonwealth Court was correct in reversing the Appellant's jury verdict against Baker. In reviewing a claim that judgment n.o.v. should not have been granted, this Court must, of course, give the plaintiff, as verdict winner, the benefit of every fact and inference of fact which may reasonably be deduced from the evidence. *Gonzalez v. United States Steel Corporation*, 484 Pa. 277, 398 A.2d 1378 (1979). We will ordinarily reverse the grant or denial of a judgment n.o.v. only when we find an abuse of discretion or an error of law which controlled the outcome of the case. *Tonkovic v. State Farm Mutual Automobile Insurance Company*, 513 Pa. 445, 521 A.2d 920 (1987). "The rendering of a judgment n.o.v. is a drastic act because it overturns the findings of a jury; the factfinding tribunal in our procedure. Judgment n.o.v. should be entered only when the facts are such that no two reasonable persons could fail to agree that the verdict was improper." *Cummings v. Nazareth Borough*, 427 Pa. 14, 233 A.2d 874 (1967). In the instant case, the trial court found no ambiguity in the PAT–Baker contract. Therefore, there was no factual question presented to the jury with regard to any ambiguity in that contract. The trial judge decided as a matter of law that the contract was not ambiguous and that:

> [a]s the engineering construction manager, Baker, under the terms of its agreement with the Port Authority was required to design and monitor the project, review and evaluate the contractor's approach to the work, require the contractor to submit a written safety program and to obtain periodic reports regarding its implementation, and

generally provide engineers and inspectors to ensure construction performance in accordance with the drawings and specifications. In order to implement this agreement, the contract between the Port Authority and Mosites subjected Mosites to control by Baker in the areas designated in the Port Authority–Baker contract. (Trial court opinion at p. 2).

In my view, Appellant's assertion that the Commonwealth Court panel usurped the jury's function as factfinder and substituted its interpretation of an ambiguous contract for the jury's interpretation is without merit. An ambiguous written instrument presents a question of fact for resolution by the finder-of-fact, whereas the meaning of an unambiguous written instrument presents a question of law for resolution by the court. *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty*, 473 Pa. 576, 375 A.2d 1267 (1977).

The Commonwealth Court interpreted the provisions of the PAT–Baker contract as a matter of law, but found an ambiguity. In an attempt to resolve what that Court saw as an ambiguity, it looked to the PAT–Mosites contract as extrinsic evidence to determine the intent of the parties as to what duties Baker undertook to perform in its contract with PAT and what, if any, duties were breached. The Commonwealth Court concluded in reading two sections of the two contracts together that Baker was never obligated under contract to control the manner in which Mosites performed its work, and that Baker never had a duty to inspect demolition procedures for safety compliance. Therefore, Baker owed no duties to PAT or Appellant which were breached or upon which a finding of negligence could be based. I do not agree.

In its opinion the Commonwealth Court noted that:

Under the original PAT–Baker contract, Baker specifically assumed the duty of [r]eviewing contractors' practices and procedures to minimize hazards associated with construction operations. However, in supplemental PAT–Baker agreements, the parties eliminated Baker's safety

review duty.[7] Therefore, even though Mr. James T. Neill, a Mosites project superintendent, testified that he "had to clear" Mosites addition of a nighttime work shift with Baker as well as PAT (N.T. 686–87), there is no evidence that Baker was responsible for assuring safe working conditions.

[7] Section 1(b) of Supplemental Agreement No. 4 eliminates Baker's construction management duties assigned in the original agreement and provides that PAT shall assign these duties at its discretion.

While it is true that Supplemental Agreement No. 4 eliminated Baker's construction management duties, that is not the agreement that was in force at the time of the accident. By that time Supplemental Agreement No. 6 to the PAT–Baker contract was in force. This agreement was entered into on July 5, 1978, and provided, *inter alia:*

Whereas, Authority again wishes to revise the scope of services under the Agreement to provide for *construction engineering management* services by Baker Engineers for the East Busway project: (emphasis added)

. . . . .

1. The work to be performed by Baker Engineers to complete the construction engineering management services for the East Busway project shall be as described in Exhibit 1, attached hereto and made part hereof. Such work shall be in addition to that work described in paragraph 1, subparagraph (a) and (b), Scope of Services, of Supplemental Agreement No. 4 dated January 3, 1977, and in addition to the scope of services described in Exhibit A of Supplemental Agreement No. 5 dated November 3, 1977. (emphasis added)

. . . . .

4. All terms and conditions of the Agreement, Supplemental Agreement No. 1, Supplemental Agreement No. 2, Supplemental Agreement No. 3, Supplemental Agreement No. 4, and Supplemental Agreement No. 5, not inconsistent with this Supplemental Agreement No. 6, shall remain in full force and effect.

Section B(1) of the "Scope of Services" appendix to Supplemental Agreement No. 6 provided that Baker shall:

> Provide field engineers, inspectors, and support personnel to monitor the construction performed under Authority issued contracts, to assure delivery of the specified systems and facilities in accordance with contract drawings and specifications.

This is the section that the Commonwealth Court found ambiguous and with regard to which it stated:

> Section B(1) is ambiguous because it appears to require Baker to monitor construction methods with an eye toward the OSHA-incorporated contract specifications. Yet Baker's oversight is required only "to assure delivery" of the finished product "in accordance with contract drawings and specifications." When contract language is ambiguous, we must examine extrinsic evidence to derive the parties' intent. (citation omitted)

The Commonwealth Court failed to note several other sections in the "Scope of Services" which may have cleared up its perceived ambiguity. Instead, it looked only at Section GP 6.4 of the standard specifications to the PAT–Mosites contract which provides:

> GP 6.4.1. The contractor shall supervise and direct the work, using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract.

The court concluded from this section that PAT had delegated sole legal responsibility for OSHA compliance to Mosites.

Review of the entire Supplemental Agreement No. 6 and the Scope of Services appendix reveals several sections that clearly impose duties on Baker which were either overlooked or misinterpreted by the court.

Section B(12) provides that Baker shall:

> Inspect construction methods prescribed by the contractor for special operations to assure compliance with approved plans.

.   .    .     .     .

B(13) Provide review of contractors offsite inspection and testing procedures and review reports to assure conformity with contract requirements and drawings. Perform visits on a periodic basis to observe shop inspections and testing procedures to observe compliance with contract specifications and standards.

.    .    .    .    .

B(16) Require contractors to provide written safety program coordinated as to all prime and subcontractors working on a site and obtain periodic reports from the contractors as to implementation of the program, and provide copies to the Authority.

I believe that these sections did impose affirmative contractual duties on Baker both with regard to inspection and monitoring of the construction methods of Mosites, and with regard to insuring that the demolition proceeded according to contract specifications which incorporate by reference OSHA safety standards. Baker was aware, by virtue of its engineering inspections on the job site, of the unsafe manner in which the demolition work was being performed. Even though it was empowered to stop any operation of the contractor for failure to comply with OSHA standards, if such failure created a hazard to life, limb or property, it failed to take any action and thereby breached its contract with PAT.

Generally, a party to a contract does not become liable for breach thereof to one who is not a party thereto. However, a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such a manner that third persons—strangers to the contract—will not be injured thereby. (citations omitted) It is not the contract per se which creates the duty, it is the law which imposes the duty because of the nature of the undertaking in the contract. If a person undertakes by contract to make periodic examinations and inspections of equipment, such as elevators, he should reasonably foresee that a normal

and natural result of his failure to properly perform such undertaking might result in injury not only to the owner of the equipment but also third persons, including the owners employees.

*Evans v. Otis Elevator Company*, 403 Pa. 13, 168 A.2d 573 (1961). I think this principle is equally applicable to the instant facts.

Accordingly, I would reverse the order of the Commonwealth Court and also reinstate the Appellant's judgment against Baker.

For the reasons set forth above, I dissent from the Majority's disposition of this case. I must also add that I deplore the hostile attitude taken by the Majority to the plight of a workingman injured on the job who later secured a substantial jury verdict in his favor. The result here is simply unjust. The General Assembly should give close attention to amending the immunity statutes so that the mischief of insulating PAT and other transportation authorities from the consequences of their own negligent acts will not be long perpetrated by the unfortunate Majority decision in this case.

LARSEN, J., joins this dissenting opinion.